**UNITED STATES of America, Appellee,**

v.

**Antonio Ruben INIGO, Appellant.**

**UNITED STATES of America, Appellee,**

v.

**Raul Armando GIORDANO, Appellant.**

**UNITED STATES of America, Appellee,**

v.

**Bruno SKERIANZ, Appellant.**

**Nos. 90–3142, 90–3151 and 90–3152.**

United States Court of Appeals,
Third Circuit.

Argued Aug. 30, 1990.
Decided Feb. 1, 1991.

Raymond M. Radulski (argued), Wilmington, Del., for appellant Antonio Ruben Inigo.

John S. Malik (argued), Wilmington, Del., for appellant Raul Armando Giordano.

Richard A. Zappa, Melanie K. Sharp (argued), Young, Conaway, Stargatt & Taylor, Wilmington, Del., for appellant Bruno Skerianz.

William C. Carpenter, Jr., Edmond Falgowski (argued), Dist. Court of Delaware, Office of U.S. Atty., Wilmington, Del., for appellee.

Before HUTCHINSON, NYGAARD and ROSENN, Circuit Judges.

OPINION OF THE COURT

HUTCHINSON, Circuit Judge.

In these three consolidated appeals, Antonio Inigo (Inigo), Raul Giordano (Giordano) and Bruno Skerianz (Skerianz) seek to overturn their Hobbs Act convictions for attempting and conspiring to extort $10,-000,000.00 from E.I. DuPont de Nemours and Company, Inc. (DuPont), in violation of

18 U.S.C.A. § 1951 (West 1984). After a jury found them all guilty of both charges, the United States District Court for the District of Delaware sentenced Skerianz to two concurrent seventy-eight-month terms of imprisonment and three years of supervised release, and ordered him to pay a $100.00 special assessment. Giordano and Inigo were each sentenced to two concurrent forty-two-month terms and three years of supervised release and were also ordered each to pay a $100.00 special assessment.

They all claim that there is insufficient evidence to sustain their convictions, that the blackmail sentencing guideline rather than the extortion sentencing guideline should have been applied and that their motions for severance and change of venue were erroneously denied.

Skerianz also argues independently that the documents seized at the time of his arrest should have been suppressed, the testimony of his two former attorneys was inadmissible because it was protected by the attorney-client privilege, he was entrapped, the sentencing guideline enhancing his sentence because he was the organizer or leader of criminal activity did not apply to him and the district court erred in relying on hearsay evidence in determining his sentence.

Additionally, Giordano and Inigo both contend, independently of Skerianz, that their sentences should have been reduced because they accepted responsibility for their acts, they were minimal rather than minor participants within the meaning of the sentencing guidelines and because the amount of money involved in the crime that the court held them responsible for was too high.

Finally, Inigo argues that certain testimony by Maria deBianchini (deBianchini) regarding a dream that he had and the theft of documents by him from DuPont's Ducilo plant in Mercedes, Argentina should have been ruled inadmissible.

While there was substantial evidence to support Skerianz's convictions, we hold that the evidence against Giordano and Inigo was insufficient as to the crimes charged against them in the indictment. We will therefore reverse their convictions. Reversal on this ground eliminates the necessity of considering their other contentions. The only one of Skerianz's other claims that has merit is his contention that the blackmail, not the extortion guideline governs his case. We will therefore remand Skerianz's case to the district court for resentencing.

## I. FACTS

DuPont is the world's largest producer of spandex fiber, which it markets under the trade name, Lycra. Because of superior technology in this highly complex technical area, it enjoys a competitive advantage in the marketplace for spandex. It manufactures Lycra in eight plants worldwide, one of which is a wholly owned subsidiary, Ducilo. Ducilo has a plant in Mercedes, Argentina.

In 1987, Skerianz, who had been in the textile industry for many years, became interested in manufacturing spandex. That November he offered his brother Carlos Skerjanc (Carlos), a DuPont employee assigned to the Engineering Department of the Ducilo plant, a job in that field. Carlos declined but gave Skerianz the names of some DuPont employees who might be interested in working for him. One of them was Jose Petrosino.[1] Carlos told his other brother Ferri Scherianz (Ferri), DuPont's Director of Manufacturing for Argentina, about Skerianz's proposal. Ferri advised Carlos to tell other DuPont officials about Skerianz's offer.[2]

---

**1.** Petrosino was also named in the indictment but was not arrested until months later. His extradition to the United States from Italy was still pending at the time this case was briefed.

**2.** While Bruno, Carlos and Ferri are brothers, each spells his last name differently. During the first Wilmington meeting, Bruno Skerianz explained that Ferri's last name was the Italian version and that Carlos's last name was the Yugoslavian version. Bruno did not specify which version his last name was.

Skerianz formed a partnership named PNB to pursue a spandex venture with Giuseppe Casucci (Casucci) and Fernando Riva (Riva). In the spring of 1988, Skerianz and Riva interviewed some Ducilo plant employees for positions with PNB. Among the DuPont employees interviewed were Giordano, Inigo and Petrosino. They were then employed in supervisory technical positions at the Ducilo plant. We will collectively refer to them as the "technicians." Inigo told his girlfriend, deBianchini,[3] that Skerianz wanted him to help build and start a Lycra plant and had offered him a salary of $4,000.00 per month. The other technicians were apparently given similar offers, and each eventually accepted his offer.

In August of 1988, Inigo resigned from his position as maintenance supervisor at Ducilo. In the next few months, Giordano resigned from his position as maintenance supervisor there and Petrosino resigned his position as a process engineer. All of them had signed agreements not to compete with DuPont when they first started to work for DuPont, and Giordano and Inigo signed reaffirmations of these agreements when they left the Ducilo plant. All three technicians accepted contracts to work for Skerianz's company, PNB, in Italy. None disclosed this to DuPont, and Giordano and Inigo gave DuPont false reasons for leaving. DeBianchini, secretary to the superintendent of the Ducilo plant and its document librarian, also quit at about the same time to join Inigo in Italy. At trial, deBianchini testified that she heard the men talk about stealing DuPont's Lycra technology so they could take it with them.

In November, 1988, Isaac Assa (Assa), owner of Lycratex, a Mexican company doing business with DuPont and Skerianz, contacted DuPont. Assa informed DuPont that he had acquired Lycra technology, through Skerianz and current and former DuPont employees, and was planning to produce Lycra with Skerianz's assistance. He asked DuPont for $20,000,000.00 and other compensation to squelch the project

and return the technology. DuPont persuaded Assa to stop doing business with Skerianz.

The technicians, who initially understood that they would work in Mexico, were informed that the Mexican Lycra project had fallen through, but they would go on working on a similar project for the Radici Company, an Italian textile concern. Learning of this, DuPont also contacted Radici and persuaded it too to stop doing business with Skerianz. In December, 1988, Skerianz informed the technicians that the Radici project would be postponed, and that they should take a vacation. When they came back to work in early January, it was at Cassuci's house.

DuPont officials first contacted the Federal Bureau of Investigation (FBI) and the United States Attorney's Office about Skerianz's Lycra activity shortly before Thanksgiving of 1988. The FBI took no action as a result of this contact. Skerianz was then contacted by his brother Ferri. Ferri was acting on behalf of DuPont at the behest of Salim Ibrahim (Ibrahim), DuPont's World–Wide Director of Lycra. After telling Ferri that he would only talk about the technology for $10,000,000.00, Skerianz agreed to meet with DuPont officials in Wilmington, Delaware.

Skerianz, along with Casucci, met with his lawyer, John Byrne (Byrne), in the morning on December 20, 1988, the day of Skerianz's first meeting with DuPont. They discussed Skerianz's proposed Lycra project and Skerianz told Byrne that he had hired three former DuPont employees. Later Skerianz and Byrne, but not Casucci, met with DuPont officials. Ibrahim and Paul Gillease, DuPont's Director of Textile Operations, represented DuPont, and DuPont secretly taped the meeting. During the meeting Skerianz indicated that the technology was his own and that he could either use it himself or sell it to certain interested buyers. He denied possession of any DuPont proprietary information and

**3.** Pursuant to an agreement to testify against her co-defendants, all charges against deBian-

chini were dismissed.

also denied employing recent DuPont employees. He proposed selling the technology to DuPont and providing non-competition agreements from everyone in his company for $10,000,000.00 and a substantial Lycra contract. No agreement was reached, but a follow-up meeting was scheduled for January.

Shortly after this meeting with DuPont Byrne withdrew as Skerianz's counsel. Byrne testified at trial that he did not know that Skerianz was using technical documents stolen from DuPont and that he never inspected any of Skerianz's technical documents. Byrne testified that he believed that Skerianz and Casucci were a team, and he was surprised that only Skerianz attended the December 20th meeting. Inigo and Giordano were under the impression that Skerianz was sailing or in Mexico at the time that the first Wilmington meeting took place.

In early January, 1989, before the next scheduled meeting between DuPont and Skerianz in Wilmington, the FBI opened a case file on Skerianz and assigned it to Special Agent Michael Kirchenbaurer. On January 9, the second secretly taped meeting took place, this time at the Hotel DuPont in Wilmington. Present at this meeting were Skerianz, his new attorney, Marvin Gersten (Gersten), Ibrahim, Gillease and FBI Special Agent Robert Rush. Rush passed himself off as DuPont employee Bob Huie. Inigo and Giordano again did not know of this January 9th meeting. Because Skerianz did not bring any sample documents with him, a third meeting was set for January 27, 1989, in Milan, Italy.

The January 27 meeting was attended by Skerianz, Ibrahim, Dr. Jacob Kleinschuster (Kleinschuster), Director of Research and Development for DuPont's Textile Division, and Jose Charre (Charre), former Ducilo plant superintendent. One of Skerianz's two security men brought in a folder of material. Skerianz inspected it, allowed the DuPont officials to see the documents in it and then, after inspecting the folder again, returned it to the security men. During the inspection thirty-three folders and approximately 1350 documents were

viewed in this fashion. It was obvious that the material in the folder included DuPont technology because many of the documents bore DuPont's symbol. Some of it, however, was already in the public domain. Inigo and Giordano were not present and were unaware of this meeting or its purpose.

After the January 27 meeting, Skerianz agreed to return the documents and provide DuPont with agreements not to compete on his own and his employees' behalf for a Lycra supply contract and $10,000,-000.00. Between January 30 and February 20, 1989, detailed negotiations aimed at consummating such an agreement took place. This resulted in a draft agreement under which Skerianz and the technicians would promise not to produce Lycra in competition with DuPont and would turn over all documents to DuPont in exchange for $10,000,000.00. Eventually a meeting was scheduled for February 27 in Geneva, Switzerland, to close the deal.

Gersten says that he did not know that the technology was DuPont's property, and felt that DuPont was merely posturing in arguing that Skerianz had misappropriated the information. He also notes that he never informed the technicians of the deal, and Skerianz in fact specifically requested him not to do so.

During the months of January and February, Giordano, Inigo and Petrosino worked with Skerianz at Casucci's home. DeBianchini later testified that they joked about the documents they stole from Ducilo and occasionally used an index of the documents while working in Casucci's home. She also testified that about a week before their arrest Inigo awakened from a nightmare and asked her not to wear a certain purple sweater in Geneva on the day of the meeting. In a letter to deBianchini written after they were arrested, Inigo explained that he asked her not to wear that sweater because she was wearing it in his dream when they were arrested.

On February 20, Skerianz announced to Inigo and deBianchini that he had sold the project to DuPont. Skerianz did not mention how much money he sold it for. De-

Bianchini testified that Inigo later speculated that Skerianz would receive between $2,000,000.00 and $3,000,000.00. Skerianz did tell Inigo that he would give Inigo, as well as Giordano and Petrosino, $50,000.00 now for signing agreements not to compete with DuPont for five years and another $50,000.00 at the end of five years. This money was to be held for them in Swiss bank accounts after DuPont paid Skerianz. Finally, Skerianz noted that he had shown DuPont the documents and would be returning them as part of the deal.

The technicians and deBianchini accompanied Skerianz to the United States Embassy in Milan where all five executed non-competition agreements. In relevant part they read: [4]

> The undersigned ... for valuable consideration received from E.I. DuPont De Nemours & Company (DuPont), the receipt and sufficiency of which are hereby expressly acknowledged, hereby covenants and agrees that he will not at any time utilize or disclose any trade secrets or other proprietary information of DuPont or its subsidiaries of which he may have knowledge.
>
> ....
>
> The undersigned represents and warrants that he has not retained any documents or copies thereof relating to DuPont technology or know-how pertaining to elastane fiber production ....

Joint Appendix (J.A.) at 1760–64. Three days later, deBianchini, Skerianz, Inigo, Giordano and Petrosino traveled with Skerianz's attorney, Gersten, to Milan, Italy to have the non-competition agreements notarized. On the same day, Skerianz and Gersten assured the group that the deal was legal. DeBianchini testified that the group then "checked" two identical sets of documents in Gersten's presence. Gersten testified that the February 23 meeting took place, but also testified that deBianchini was not present and that he never saw any documents.

The next day Skerianz met with Ibrahim to finalize the details of the exchange. On February 26, 1989, Skerianz, Inigo, Giordano, Petrosino and deBianchini drove to Geneva, Switzerland. The exchange was to take place the next morning at 11:00 a.m. at the Citibank building. Although Gersten advised Skerianz not to go through with the deal, Skerianz chose not to heed his advice. The meeting was aborted, however, when Skerianz's own counter-surveillance told him not to go to the meeting because Swiss police were detected nearby. Skerianz told the others to go back to the hotel and instructed Inigo and Petrosino to get their cars. As Skerianz, Inigo, Giordano and deBianchini were about to enter their cars, they were arrested by Swiss police who also seized the documents. Petrosino avoided arrest at that time but was arrested months later in Italy.

In addition to the testimony of the government agents, Byrne, Gersten, deBianchini and the DuPont employees who had negotiated with Skerianz, physical evidence was produced at trial. It included fingerprints of Inigo, Giordano and Skerianz that were found on the folders containing the copies of the documents, handwriting on the folders containing the original documents that was identified as Petrosino's and notations made in Inigo's handwriting found on two labels on the folders and some of the documents themselves.

## II. *JURISDICTION*

A federal district court has jurisdiction over federal criminal cases under 18 U.S.C.A. § 3231 (West 1985). The technicians and Skerianz were here indicted for violations of 18 U.S.C.A. § 1951. It reads:

> (a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in viola-

---

4. Although the non-competition agreements stated that the signer received valuable consideration from DuPont, the technicians, as deBian- chini testified, were not to receive anything directly from it. Skerianz was to arrange to compensate them for adhering to the agreements.

tion of this section shall be fined not more than $10,000 or imprisoned not more than twenty years, or both.

(b) As used in this section—

. . . .

(2) The term "extortion" means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.

(3) The term "commerce" means commerce within the District of Columbia, or any Territory or Possession of the United States; all commerce between any point in a State, Territory or Possession, or the District of Columbia and any point outside thereof; all commerce between points within the same State through any place outside such State; and all other commerce over which the United States has jurisdiction.

18 U.S.C.A. § 1951 (West 1984). In determining whether the district court's assertion of jurisdiction was proper, the definition of commerce under § 1951 takes on added significance. To resolve this issue, we assume the acts as charged were proved and ask whether they would affect commerce as commerce is defined in the statute, not whether the evidence is sufficient to prove them. The question arises here because most of the conduct alleged took place in Europe and South America and the holdings of DuPont are so great that even this relatively large extortionate demand might not inflict crippling harm upon it. Of course, proof of these facts also does go to the merits issue of sufficiency.

Even if none of the parties' overt acts had occurred in this country, as indeed is the case with Inigo and Giordano, Congress could give the district court jurisdiction under the commerce clause so long as

their activities affected DuPont's commercial ventures in interstate commerce within the United States. *See Stirone v. United States*, 361 U.S. 212, 215, 80 S.Ct. 270, 272, 4 L.Ed.2d 252 (1960) (Hobbs Act utilizes all of Congress's commerce clause power and reaches even a minimal interference with commerce); *United States v. Staszcuk*, 517 F.2d 53, 59–60 (7th Cir.) (in banc) (same), *cert. denied*, 423 U.S. 837, 96 S.Ct. 65, 46 L.Ed.2d 56 (1975). The jurisdictional question thus resolves itself into whether Congress intended to reach extortionate crimes that have only a slight effect on interstate commerce because the loss of $10,000,000.00, while large in absolute terms, would arguably be insignificant in its overall commercial effect. We think that Congress plainly did intend to subject persons whose activities were meant to extort $10,000,000.00 from a firm engaged in interstate commerce to criminal liability.[5]

Indeed, this Court has already dealt with this question. In *United States v. Mazzei*, 521 F.2d 639 (3d Cir.) (in banc), *cert. denied*, 423 U.S. 1014, 96 S.Ct. 446, 46 L.Ed.2d 385 (1975), the defendant questioned both "the jurisdictional reach of the Hobbs Act and the substantive content of the crime of extortion which it defines." *Id.* at 640. In *Mazzei*, B.M.I., Incorporated, a holding company located in Pittsburgh, sought to lease some of the extra space in its headquarters building to reduce overhead costs. Mazzei was a Pennsylvania state senator seeking a location in Pittsburgh for a regional office of the new Bureau of State Lotteries. Even though Mazzei had no authority to engage in arranging leases for the Bureau, he met with B.M.I.'s secretary-treasurer on several occasions to discuss the terms of a lease involving B.M.I.'s extra space. *Id.* at 640–41. During one of their meetings, Mazzei informed the treasurer that it was common practice to submit ten percent of the gross rental amount to a senate finance re-election committee. The lease was entered into

---

**5.** We point out that it is Inigo and Giordano's alleged participation in the attempted extortion, not their acts of stealing DuPont's trade secrets, acts that would seem to be totally extra-territorial, that are the basis of the district court's jurisdiction over their conduct, a distinction that is important on the issues of sufficiency they raise. In that connection, a proven extra-territorial theft would be some evidence of their intent, if their knowledge of the scheme and acts by them to further it were proven.

and Mazzei received $20,055.00 from B.M.I. over a sixteen month period. *Id.* at 641.

Sitting in banc this Court unanimously agreed that the amount of the payments from B.M.I. to the defendant "depleted the assets of B.M.I. and thereby affected its power to operate in interstate commerce." *Id.* at 642.[6] In broadly stating the jurisdictional threshold, we said:

> This position accords with our previous holdings that where the resources of an interstate business are depleted or diminished "in any manner" by extortionate payments, the consequent impairment of ability to conduct an interstate business is sufficient to bring extortion within the play of the Hobbs Act. *United States v. Addonizio,* 451 F.2d 49 (3rd Cir.1971), *cert. denied,* 405 U.S. 936, 92 S.Ct. 949, 30 L.Ed.2d 812 (1972); *United States v. Provenzano,* 334 F.2d 678 (3rd Cir.), *cert. denied,* 379 U.S. 947, 85 S.Ct. 440, 13 L.Ed.2d 544 (1964).

*Id.* Certainly Skerianz's alleged demand of $10,000,000.00 from DuPont would also fulfill the requirement that the offense set out in § 1951 must affect commerce.

The relative wealth of DuPont is not a factor under the *Mazzei* analysis. Since DuPont, like B.M.I. in *Mazzei,* conducts a substantial amount of business in the United States, the fact that much of the conduct alleged took place outside of the United States is of no consequence.[7] Therefore, the district court had jurisdiction over this case under § 3231 *via* § 1951. We have appellate jurisdiction over the defendants' appeals from conviction and sentencing under 28 U.S.C.A. § 1291 (West Supp. 1990).

## III. *DISCUSSION*

A. *The Sufficiency of the Evidence Claims*

Because the resolution of the sufficiency issues may dispose of other questions the parties raise, we will address sufficiency first. All three defendants claim that the evidence presented was insufficient to convict them.

In dealing with those issues, the following general comments are appropriate, and we note at the outset:

> It is not for [an appellate court] to weigh the evidence or to determine the credibility of witnesses. The verdict of a jury must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it.

*United States v. Glasser,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). We must, however, reverse a conviction when the evidence clearly fails to support the verdict. *Government of the Virgin Islands v. Brathwaite,* 782 F.2d 399, 404 (3d Cir.1986).

■ The substantive offense that the defendants are charged with attempting and conspiring to commit, 18 U.S.C.A. § 1951, is entitled "Interference with commerce by threats or violence." The indictments returned under it require the government to prove that each of the defendants' attempted or conspired to obtain property from DuPont with its consent, induced by the fear their threats of economic loss occasioned, and that they "obstruct[ed], delay[ed], or affect[ed] commerce" in doing so. Typescript, *supra,* at 647–48 (quoting 18 U.S.C.A. § 1951(a)). The requisite fear suffered by the victim of the extortion need not be one of physical harm. A fear of economic loss is adequate under the Hobbs Act. *United States v. Addonizio,* 451 F.2d 49, 72 (3d Cir.1971), *cert. denied,* 405 U.S. 936, 92 S.Ct. 949, 30 L.Ed.2d 812 (1972). Under § 1951, the economic loss to be feared is not the loss of the property ob-

---

**6.** While two members of the Court dissented, they did so on other grounds, noting that "[we] agree that the transaction alleged in the indictment had a sufficient impact upon interstate commerce to sustain constitutionally the exercise of federal criminal jurisdiction." *Mazzei,* 521 F.2d at 647 (Gibbons, J. dissenting) (footnote omitted).

**7.** Because the facts of this case do not require us to, we do not reach the issue of whether completely extraterritorial extortionate conduct involving a foreign corporation would satisfy the jurisdictional demands of § 1951 if that corporation conducted only minimal business in the United States.

tained by the extortioner, but the threatened economic harm that the victim could reasonably believe would befall it if the extortionate demand were not met. Typescript, *supra*, at 648 (quoting 18 U.S.C.A. § 1951(b)). The potential economic loss need not be one that would put an entity out of business. Instead, there must just be a reasonable fear of an economic loss sufficient to induce the victim to part with the property demanded rather than face the threatened consequent loss. In other words, the victim must reasonably think the threatened loss makes it worth his while to play the extortioner's game.[8] *See Addonizio*, 451 F.2d at 72; *but see United States v. Brecht*, 540 F.2d 45, 52 (2d Cir. 1976) (an arguably broader statement of the standard concerning the loss of a single contract to a publishing company where there was no indication that the inability to obtain this particular contract would impair the company's well-being was sufficient to establish fear under the Hobbs Act), *cert. denied*, 429 U.S. 1123, 97 S.Ct. 1160, 51 L.Ed.2d 573 (1977).

### 1. The Evidence Against Giordano and Inigo

#### a. The Attempt Convictions

Giordano and Inigo forcefully argue that the evidence presented at trial is insufficient to support their convictions for attempted extortion. Both of them stress that they were not involved in the negotiation of the deal and that they did not know of any plan to extort money from DuPont. For support, they point to the testimony of Gersten and deBianchini at trial. Aside from deBianchini and Gersten's testimony, the only evidence that Inigo and Giordano were among the former DuPont employees working for Skerianz was their presence in Switzerland at the time the arrests by Swiss police aborted the extortionate scheme and their fingerprints on some of the documents Skerianz sought to sell to DuPont.

Gersten testified that Skerianz had told him not to tell the others about his negotiations with DuPont. DeBianchini testified that the first time that the technicians knew that Skerianz was selling his project to DuPont and had worked out an agreement in which he and the technicians would not produce Lycra in competition with DuPont was one week before the transfer and that it was presented to them as a "legal deal."

The government says the evidence showing that Giordano and Inigo had knowledge of the stolen DuPont papers, together with their knowledge that the deal included their return, is evidence sufficient to prove that they had knowledge of the extortion and the intent to participate in the extortion. The government notes that Giordano and Inigo had access to the documents in Argentina and that deBianchini testified about times when both of them discussed and handled the documents. She also testified that these documents came from the Ducilo plant. Basically, the government contends that the technicians' intent could be inferred indirectly from the wholly extraterritorial theft of DuPont's trade secrets about the spandex process. However, to prove extortion or attempted extortion, the government first has to show Inigo and Giordano knew that extortion was being proposed.[9] *See United States v. Dozier*, 672 F.2d 531, 542 (5th Cir.), *cert.*

---

**8.** As we noted in *Addonizio*, it is sometimes necessary to distinguish extortion from bribery under the Hobbs Act, a distinction that the New York courts had already made in interpreting former New York Penal Law § 850, the statute on which 18 U.S.C.A. § 1951 was based. Under the New York cases, bribery was a voluntary payment in order to influence an official duty, but extortion was a payment under duress in order to protect some interest for which the payer already had legal protection. *Addonizio*, 451 F.2d at 72 (citing *Hornstein v. Paramount Pictures*, 22 Misc.2d 996, 37 N.Y.S.2d 404 (1942),

and *People v. Dioguardi*, 8 N.Y.2d 260, 203 N.Y. S.2d 870, 168 N.E.2d 683 (1960)).

**9.** The government may have chosen to prosecute Inigo and Giordano along with Skerianz for complicity in Skerianz's acts of attempted extortion because it could not prosecute them directly for theft. Prosecution for any theft-related crime would require a showing that the wholly extraterritorial theft was an offense against the United States, not just some other jurisdiction.

*denied,* 459 U.S. 943, 103 S.Ct. 256, 74 L.Ed.2d 200 (1982).

■ An obvious element of extortion is an extortionate demand, *i.e.* a demand by the extortioner that the victim pay the extortioner a valuable consideration for return of the victim's property. *See United States v. Brecht,* 540 F.2d 45, 51 (2d Cir. 1976), *cert. denied,* 429 U.S. 1123, 97 S.Ct. 1160, 51 L.Ed.2d 573 (1977); *United States v. Hyde,* 448 F.2d 815, 833 (5th Cir.1971), *cert. denied,* 404 U.S. 1058, 92 S.Ct. 736, 30 L.Ed.2d 745 (1972). It follows that a person cannot be criminally responsible for participation in an extortionate scheme unless he or she has knowledge that an extortionate demand had been made. This is especially so here as attempt offenses require specific intent. *See United States v. Bailey,* 444 U.S. 394, 405, 100 S.Ct. 624, 632, 62 L.Ed.2d 575 (1980) (intent to engage in criminal conduct is a required element of attempt offenses); *United States v. Everett,* 700 F.2d 900, 908 (3d Cir.1983) (same); *United States v. Berrigan,* 482 F.2d 171 (3d Cir.1973) (same); *United States v. Aponte–Suarez,* 905 F.2d 483, 489 (1st Cir.) (same), *cert. denied,* —— U.S. ——, 111 S.Ct. 531, 112 L.Ed.2d 541 (1990).

The government recognizes that a person cannot commit a crime requiring intent, let alone specific intent, if he or she does not know that the crime is ongoing. Thus, it attempts at once to demonstrate Inigo and Giordano's knowledge of Skerianz's extortionate scheme. Its proof focuses on Inigo and Giordano's knowledge of Skerianz's willingness to enter into some agreement with DuPont that contemplated return of the technical documents they had taken from DuPont when they resigned their positions at the Ducilo plant.

■ This record does, of course, show Skerianz made an extortionate demand for DuPont to pay $10,000,000.00 for the return of technical documents Inigo and Giordano had stolen from DuPont. It also shows that Inigo and Giordano knew Skerianz planned to sell DuPont the spandex project Skerianz hired them to work on. It does not show they knew Skerianz initiated an extortionate scheme by demanding money from DuPont. Inigo and Giordano were not privy to Skerianz's negotiations with DuPont. When they finally learned Skerianz's spandex project would be sold, they were expressly told the sale was legal and were not told how it was arranged.

Inigo and Giordano's theft of DuPont's technical documents certainly facilitated Skerianz's attempt at extortion; but even if Inigo and Giordano knew that those documents might be involved in the sale of Skerianz's project, this would not in and of itself show that they also knew that Skerianz was using the documents to attempt extortion. Nowhere in the record is there any evidence to support an inference that the technicians knew that the documents they had purloined were being used by Skerianz to make an extortionate demand on DuPont. Even with respect to the parties' activities during the week preceding the aborted Geneva meeting, the record is silent on this point. At best, the record shows only that the technicians then learned that DuPont's proposed purchase of Skerianz's project required them to sign new non-competition agreements. This does not show they knew that Skerianz was engaged in an extortionate scheme, but is equally consistent with the view, argued by Inigo and Giordano on appeal, that they believed DuPont had merely made a legitimate offer to purchase the Skerianz project.

The government argues, nevertheless, that on the evidence presented, Inigo and Giordano "had" to know of Skerianz's extortion scheme. It is clear that Skerianz did not want Giordano and Inigo to know anything about the arrangement he proposed to make with DuPont until he was ready to tell them. Thus, Inigo was led to believe that Skerianz was sailing at the time that Skerianz was meeting with DuPont officials in Wilmington. Even after Inigo and Giordano were told about the deal, its details were not disclosed to them, and at one point, Skerianz reassured Giordano and Inigo that the proposed arrangement was legal. Inigo and Giordano's lack of knowledge and Skerianz's representations concerning the legality of the deal

were established at trial by the government's own witnesses, Gersten and deBianchini. Again, there is no evidence to show the technicians knew Skerianz made an extortionate demand as opposed to an offer from DuPont to purchase the technology.

The fallacy in the government's argument can be shown by an analogy. Suppose a case in which a thief sells his loot to a third party. The purchaser, without telling the thief, tells the victim that he will suffer embarrassment, financial or otherwise, unless he pays the purchaser of the loot for return of his own property. The thief's lack of knowledge of the extortionate scheme is akin to Inigo and Giordano's.

Still, the government goes on to argue that Inigo and Giordano's willingness to sign covenants not to compete, knowing that they would receive "valuable consideration" for the signing, demonstrates their knowledge of Skerianz's attempt to extort and their own intent to participate. It points to deBianchini's testimony that in mid-February, when Skerianz told Inigo and Giordano of the proposed sale, Skerianz said that all of them would get money for signing covenants not to compete with DuPont and returning the stolen documents to DuPont. Because Giordano and Inigo knew that the technology was Du-Pont's and not their own, the government says this translates irrefutably into the intent to join the plan to extort.

The covenants not to compete do not solve the government's problem. Again, there is no evidence showing the technicians demanded any money from the victim, DuPont, to renew their faithless promises, or that they knew the proposed transaction included an extortionate demand. The record shows only that Skerianz offered the technicians money for signing new non-competition agreements and presented their signing as a demand from DuPont.

This record shows only that Inigo and Giordano misappropriated DuPont's trade secrets and violated their original agreements not to compete in order to gain employment with PNB, a potential competitor of DuPont. It does not show they intended to threaten DuPont with economic harm unless they were paid off, or knowingly participated with Skerianz in a scheme to extort. The consideration they were to receive for renewing their covenants not to compete and then abiding by them for five years, consideration that was to be given to them by Skerianz and not DuPont, does not show they knew of Skerianz's extortionate scheme to induce DuPont to buy back its own technology by playing on DuPont's fear of the economic consequences it would suffer if its own spandex technology were used competitively.

Accordingly, we hold that the evidence is insufficient to sustain Inigo and Giordano's convictions for attempted extortion. Therefore, we will reverse Giordano and Inigo's convictions of attempt to extort under § 1951.[10]

### b. The Conspiracy Convictions

■ The language of section 1951 specifically prohibits a conspiracy to commit extortion but does not define "conspiracy." For conspiracy convictions, this Court requires (1) some evidence of an agreement among the conspirators and (2) knowledge on behalf of each of the conspirators that the agreement "had the specific unlawful purpose charged in the indictment." *See United States v. Terselich*, 885 F.2d 1094, 1097 (3d Cir.1989).

■ The government argues that Giordano and Inigo conspired with Skerianz, Petrosino and two unindicted co-conspirators, Riva and Casucci. They point out that Casucci had been in Delaware for the first meeting with DuPont although he did not attend the meeting. They also note that Casucci was a partner in PNB with Skerianz and Riva, that it was this firm that hired Giordano, Inigo and Petrosino away from DuPont, and that the techni-

---

**10.** In concluding the evidence against Inigo and Giordano is insufficient to show an attempt to extort, we assume, without deciding, that de-Bianchini's testimony about Inigo's dream was admissible. At best, the dream may be evidence that Inigo had a guilty state of mind. It does not show what he thought he might be guilty of.

cians (Giordano, Inigo and Petrosino) spent a lot of time working with the documents in Casucci's house. Skerianz also told Du-Pont officials on many occasions that he represented a "team."

Giordano and Inigo again focus on their lack of knowledge of the extortion scheme. Hence, their argument here also gets to the core of the agreement to extort. They again point out that they were kept completely in the dark about Skerianz's extortionate plan, that the sale was presented to them as completely legal and that they were told that DuPont had approached Skerianz. By noting that the theft of the documents occurred before the December 20, 1988, date in which the indictment say the conspiracy began, they argue that no wrong occurred during the time charged. They maintain the evidence shows they were under the impression that they had been hired by PNB to help construct a new plant and that to stop them from competing, DuPont offered to "buy them out." This, they claim, explains away any inferences drawn from the covenant not to compete.

The evidence against Giordano and Inigo on the conspiracy convictions is insubstantial. While agreement to work together to produce a spandex product in competition with DuPont's Lycra product satisfies the first prong of *Terselich,* the evidence does not show that Giordano and Inigo entered into any agreement to extort money from DuPont or again even that they knew of Skerianz's extortionate plan. Skerianz's persistent efforts to keep the technicians either uninformed or misinformed, in the absence of any evidence affirmatively showing their knowledge of his scheme to extort, destroys any inference that Giordano and Inigo had the knowledge that the agreement "had the specific purpose charged in the indictment." *Terselich,* 885 F.2d at 1097. To the contrary, the evidence

shows only that they had agreed to work for PNB to design a new plant for production of spandex. It does not show they agreed to take part in Skerianz's scheme to extort money from DuPont by playing on its fear of economic harm if it failed to meet Skerianz's demand that it buy back its own technology. Because the evidence offered to show that Giordano and Inigo had knowledge of the scheme to extort lacks substance, we will also reverse their conspiracy convictions.[11]

### 2. The Evidence Against Skerianz
#### a. The Attempt Conviction

 Skerianz's own attack on the sufficiency of the evidence on the count of attempted extortion focuses on two points. He says first that DuPont's fear of economic loss was not reasonable and second, that he too lacked criminal intent.[12]

Skerianz contends that DuPont's fear was not reasonable because it had already thwarted his two prior attempts at constructing Lycra production facilities, he possessed less than five percent of the Lycra documents from the Ducilo plant and that anyway DuPont was at fault for not guarding its own confidential documents. These contentions beg the question. While the two prior attempts Skerianz made to build a Lycra plant may have been stopped by DuPont, Skerianz still had possession of DuPont's technology and he could have sold it to other third parties or used it himself. In fact, this was one of the fears the DuPont officials expressed at the December 20 meeting with Skerianz. The documents that Skerianz possessed, while relatively small in number, were enough to pose "a very serious threat to DuPont" according to DuPont's Research and Development Director for the Textile Division, Dr. Kleinschuster. Further, what matters is how important the documents Skerianz had were to DuPont, not their number.

---

**11.** Having reversed the convictions of Giordano and Inigo, their remaining claims regarding the sentencing guidelines, the motions for severance and change of venue and Inigo's arguments regarding the admissibility of deBianchini's testimony about his dream, *see supra* note 10, need not be considered.

**12.** Skerianz does not independently argue that the extortionate demand, if made, did not affect commerce.

Ibrahim, Kleinschuster and Charre viewed the documents at the January 27 meeting and testified that they contained a significant amount of confidential information which would substantially reduce DuPont's competitive edge in the spandex market. While the record does not show DuPont's existence was endangered by Skerianz's threat, the evidence does support the jury's finding that DuPont had a reasonable fear that if Skerianz used the pilfered technology to enter the spandex market, its economic harm would exceed Skerianz's $10,000,000.00 demand. *See United States v. Agnes*, 753 F.2d 293, 302 n. 15 (3d Cir.1985) (an apprehension of economic loss is sufficient to establish fear); *Addonizio*, 451 F.2d at 72 (same).

Skerianz also claims that he lacked the requisite criminal intent because his counsel, Gersten, had the "preeminent role" in the negotiations. This argument fails. It was Skerianz who asked DuPont for $10,000,000.00 in the December 20 meeting, a meeting that took place before Gersten represented him. Further, it was Skerianz who presented the documents embodying DuPont's spandex trade secrets to the DuPont officials at the January 27 meeting. Gersten did not even attend this meeting. The evidence produced at trial demonstrates that Skerianz had the requisite criminal intent. It was sufficient to support Skerianz's conviction on the charge of attempted extortion.

### b. The Conspiracy Conviction

■ On the conspiracy charge, Skerianz tries to turn the fact that the technicians were consistently kept in the dark about the proposed sale to DuPont to his own present advantage. He contends that because the sale was presented to them as a legal business transaction, he cannot be guilty of conspiring with them. Skerianz also argues that the dates in the indictment include conduct between December 20, 1988, and February 27, 1989, and as a result the hiring of the technicians was outside the scope of the indictment. Further, because the technicians were employed by PNB, the fact that they worked together at Casucci's house was nothing but normal. These arguments do not work for Skerianz. Inigo and Giordano are not the only possible co-conspirators.

Skerianz's first attorney, Byrne, testified that Casucci met with Skerianz and him before the first Wilmington meeting. Since the technicians also worked with the DuPont technology in Casucci's home under Skerianz's direction, there is sufficient evidence to sustain the jury's finding of a conspiracy involving Skerianz and Casucci. Thus, we will affirm Skerianz's conspiracy conviction.

### B. *Skerianz's Motion for a Change in Venue*

We review the denial of a motion for a change in venue for abuse of discretion. *United States v. Kopituk*, 690 F.2d 1289, 1322–23 (11th Cir.1982), *cert. denied*, 461 U.S. 928, 103 S.Ct. 2089, 2090, 77 L.Ed.2d 300 (1983).[13]

Motions for change of venue are governed by Federal Rule of Criminal Procedure 21(a). That rule provides that:

> The court upon motion of the defendant shall transfer the proceeding as to that defendant to another district whether or not such district is specified in the defendant's motion if the court is satisfied that there exists in the district where the prosecution is pending so great a prejudice against the defendant that the defendant cannot obtain a fair and impartial trial at any place fixed by law for holding court in that district.

Fed.R.Crim.P. 21(a).

■ Skerianz first points to the media coverage of his case as well as the unique prominence of DuPont within the Delaware community and asserts that these factors made a fair trial in Wilmington impossible for him. *See Sheppard v. Maxwell*, 384 U.S. 333, 351–52, 86 S.Ct. 1507, 1516, 16 L.Ed.2d 600 (1966) (pervasive community

---

**13.** We will consider Skerianz's arguments on change of venue on their merits, but note that he arguably waived them when he did not renew his motion for a change in venue at the close of voir dire.

prejudice eliminates the need to show prejudice in the jury seated). While DuPont's place in Delaware's economic and social communities may be unique, the record before us does not show that prejudice in the seated jury can be assumed.

Skerianz says, though, that excessive media attention added to the prejudice. The case did attract some media attention, but there was no indication that this attention was overly prejudicial, much less that it was so prejudicial that it precluded an impartial trial, even when coupled with DuPont's importance to Delaware's and Wilmington's economy. A number of the articles Skerianz relies on appeared in the *New York Times*, the *Wall Street Journal* and the *Washington Post*. These are less likely to have an influence on the jury than would articles from Delaware newspapers. Of the articles that appeared in the Delaware papers, only one was on the front page. Moreover, all the articles were primarily factual, a factor that undercuts a finding of prejudice. *See United States v. Haldeman*, 559 F.2d 31, 61–62 (D.C.Cir. 1976), *cert. denied*, 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977). The district court did not abuse its discretion when it denied Skerianz's motion for a change of venue.

### C. *Skerianz's Motion to Sever*

We also review the denial of Skerianz's motion for severance for abuse of discretion. *United States v. Boscia*, 573 F.2d 827, 832 (3d Cir.), *cert. denied*, 436 U.S. 911, 98 S.Ct. 2248, 56 L.Ed.2d 411 (1978). Although the portions of the record the parties furnish in their appendices do not show that the trial court expressly ruled on Skerianz's motion to sever, its denial of that motion is implicit in the joint trial itself.

Motions to sever are governed by Federal Rule of Criminal Procedure 14. The Rule provides, in part, that:

> If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires.

Fed.R.Crim.P. 14.

Skerianz does not separately argue the severance issue, but simply adopts Giordano's argument that the evidence showing the technicians' theft of documents from Ducilo could not be compartmentalized by the jury, and therefore the denial of his motion prejudiced him.[14]

A defendant is entitled to severance when the evidence against one defendant cannot be compartmentalized and the jury is likely to consider it to the prejudice of a defendant against whom it is not properly directed. *See United States v. Meester*, 762 F.2d 867, 883 (11th Cir.), *cert. denied*, 474 U.S. 1024, 106 S.Ct. 579, 88 L.Ed.2d 562 (1985). A district court abuses its discretion in denying a motion to sever if the prejudice that resulted from the denial of severance is patently severe. *See Meester*, 762 F.2d at 883. To succeed on a

---

**14.** The government argues that Skerianz waived the compartmentalization argument because the argument Giordano makes is one that Skerianz did not raise below. The record shows that Skerianz did raise compartmentalization below. *See* J.A. at 192 (Skerianz's memorandum in support of motion for severance). Thus, even though Giordano's argument on severance is mooted by the reversal of his conviction, it still must be considered because Skerianz adopted it as his own pursuant to Federal Rule of Appellate Procedure 28(i). We therefore reject the government's argument on waiver. We do note that Skerianz did not renew his severance motion at either the close of the government's case nor the close of all the evidence, but the government does not raise this failure in support of its waiver argument. Other United States Courts of Appeal have held that such a failure to renew th motion waives the severance issue. *See United States v. Swift*, 809 F.2d 320, 323 (6th Cir. 1987) (severance motion must be renewed at close of evidence); *United States v. Long*, 706 F.2d 1044, 1053 (9th Cir.1983) (same); *United States v. Reed*, 658 F.2d 624, 629 (8th Cir.1981) (severance motion must be renewed at the close of the government's case or all evidence), *cert. denied*, 458 U.S. 1002, 102 S.Ct. 1636, 71 L.Ed.2d 870 (1982). This question has never been decided by us and we refuse to consider it now in the absence of any briefing by the parties.

compartmentalization defense the jury must be unable "to make an individualized determination as to each defendant." *Id.* It is, however, customary to try persons charged as co-conspirators together, and severance of a co-conspirator's trial is required only for compelling reasons. *See, e.g., id.; Boscia,* 573 F.2d at 827; *United States v. Somers,* 496 F.2d 723 (3d Cir.), *cert. denied,* 419 U.S. 832, 95 S.Ct. 56, 57, 42 L.Ed.2d 58 (1974).

■ This record shows no compelling likelihood of prejudice against Skerianz. The theft evidence clearly related to Giordano and Inigo only and could be kept separate by the jury. Indeed, the government never argued Skerianz was involved in the theft. Therefore, we hold that the district court did not abuse its discretion when it refused to grant Skerianz's motion to sever.

### D. *Skerianz's Motion to Suppress the Documents*

■ We review the district court's refusal to suppress the documents the Swiss police seized when they arrested Skerianz in Geneva for clear error as to the underlying facts, but exercise plenary review as to its legality in the light of the court's properly found facts. *United States v. Mitlo,* 714 F.2d 294, 295–96 (3d Cir.), *cert. denied,* 464 U.S. 1018, 104 S.Ct. 550, 78 L.Ed.2d 724 (1983). Skerianz concedes, as he must, that the Fourth Amendment does not apply to a seizure of an alien's property on foreign soil. *United States v. Verdugo–Urquidez,* —— U.S. ——, 110 S.Ct. 1056, 1066, 108 L.Ed.2d 222 (1990). In *Verdugo–Urquidez,* however, the Supreme Court expressly refused to rule on the issue of whether such a seizure could violate an accused's Fifth Amendment due process rights, holding only that Fourth Amendment rights are not implicated when officials search the residence of a foreign national outside of the United States. *Id.,* 110 S.Ct. at 1068 (Kennedy, J., concurring). Therefore, Skerianz argues that his constitutional rights to both procedural and substantive due process were violated by the FBI assisted Swiss officials's seizure and so the admission of the seized documents at trial was error.

■ Skerianz points to no facts that would show any violation of his Fifth Amendment rights to due process. He says the FBI was working closely with the Swiss police, and indeed the record indicates this is so; but he does not point to any interrogation or other conduct that might implicate due process other than a conclusory statement that the FBI's cooperation with the Swiss police who seized the documents was not in conformity with general principles of fairness and privacy. This argument lacks merit. Skerianz's privacy right as to the documents resides in the Fourth Amendment and his nebulous "fairness" argument is wholly insufficient to trigger the due process clause of the Fifth Amendment. We will therefore affirm the district court's order denying Skerianz's motion to suppress the documents seized by Swiss authorities and turned over to the FBI.

### E. *Skerianz's Attorney–Client Privilege Claims*

Over objection, two of Skerianz's attorneys, Byrne and Gersten, testified concerning their representation of him. Skerianz argues that the attorney-client privilege makes their testimony inadmissible. The government contends that the testimony was admissible under the crime-fraud exception to the attorney-client privilege. Resolution of this issue involves a mixed question of law and fact. In such cases, we review the legal issues underlying the privilege claim *de novo* but review the facts underlying the claim of privilege for clear error. *See United States v. Ortiz,* 878 F.2d 125, 126–27 (3d Cir.1989).

■ The attorney-client privilege protects the confidences exchanged between an attorney and a client. It gives the client the right to object to disclosure of any privileged communications made during the relationship. However, when the legal consultation is in furtherance of a crime or fraud, the statements exchanged will not be protected. Only disclosure of confidential information concerning past wrongdo-

ing is protected. *See In re Impounded Case (Law Firm)*, 879 F.2d 1211, 1213 (3d Cir.1989); *In re Grand Jury Proceedings*, 604 F.2d 798, 802–03 (3d Cir.1979). With these principles in mind, we consider Skerianz's claims of privilege separately with respect to the testimony of each attorney.

### 1. *The Testimony of John Byrne*

▉ Byrne represented Skerianz for only one day, December 20, 1988, the day Skerianz first met with DuPont in Wilmington. Byrne testified about the events that transpired that day as well as Skerianz's request that Byrne represent him at the meeting. Discussing what happened at his breakfast meeting with Skerianz and Casucci, Byrne said that he became concerned when Skerianz mentioned that he had hired three former DuPont employees. Byrne said that he was later surprised when Casucci did not attend the meeting with the DuPont officials. Testimony by Byrne concerning the meeting itself involves communications made in the presence of DuPont employees that are not legally privileged because they were not made in confidence.

Skerianz, however, also maintains that the privilege applies to Byrne's testimony about the suspicions of illegality that led Byrne to withdraw as Skerianz's counsel. Skerianz says Byrne's testimony that he became leery about the deal's legality when he learned that Skerianz had hired three former DuPont employees had to be based on wrongs that Skerianz had already committed. This argument also fails. Both the December 20 meeting and Skerianz's initial request to have Byrne represent him were in furtherance of the ongoing extortion. Although the theft of DuPont's secrets by Inigo and Giordano was a wrong that had already occurred, the attempted extortion was still in process at the time of Byrne's representation. Thus, Byrne's testimony dealt with a crime that was ongoing at the time of the communications, and so the attorney-client privilege does not apply. *Grand Jury Proceedings*, 604 F.2d at 803 (the attorney-client privilege does not apply to consultations with an attorney about a continuing crime).

### 2. *The Testimony of Marvin Gersten*

Gersten began representing Skerianz in late December 1988 and continued to represent him until Skerianz was arrested. At trial, Gersten testified about his representation of Skerianz during the negotiations with DuPont, the very negotiations which constituted the attempt to extort $10,000,-000.00 from DuPont. Gersten never testified about any past wrongdoing of Skerianz. The attorney-client privilege, therefore, also lacks any application to Gersten's testimony. The district court did not err in admitting the testimony of either Byrne or Gersten.

### F. *Skerianz's Entrapment Claim*

▉ Skerianz contends that he was entrapped because the government became involved earlier than January 5, 1989, when it first opened a file on him. To be entrapped, a defendant must be induced to commit a crime by the government for which he lacks a predisposition. *See United States v. Fedroff*, 874 F.2d 178, 181 (3d Cir.1989). Once a defendant puts in evidence from which a lack of predisposition and inducement can be inferred, the burden of proof shifts to the government to prove entrapment. *See United States v. Gambino*, 788 F.2d 938, 943 (3d Cir.), *cert. denied*, 479 U.S. 825, 107 S.Ct. 98, 93 L.Ed.2d 49 (1986).

▉ Skerianz argues that the government failed to meet its burden of proving beyond a reasonable doubt that he was not entrapped because it did not expressly deny involvement before January 5. Our review of Skerianz's entrapment claim is plenary. *United States v. Pervez*, 871 F.2d 310, 314 (3d Cir.), *cert. denied*, — U.S. —, 109 S.Ct. 3258, 106 L.Ed.2d 603 (1989). In making this argument, Skerianz skips over the requirement that a defendant must produce evidence from which entrapment could be inferred before the burden of persuading the fact-finder that there was no entrapment falls on the government. *See Fedroff*, 874 F.2d at 182.

The record here shows Skerianz first made his extortionate demand on Decem-

ber 20, 1988, and contains no evidence of government involvement before January 5. The testimony that Skerianz made his demand to the DuPont people approximately two weeks before the government opened its file on him is uncontradicted and defeats any claim of inducement. Even after the government became involved it played no role in Skerianz's extortion scheme beyond monitoring his activities and arranging to have foreign officials aid in their apprehension of him when he attempted to consummate the crime. Moreover, even if the evidence was sufficient to permit a reasonable jury to find inducement, there remains abundant evidence of predisposition. Skerianz's history of involvement with Assa and Radici are especially persuasive on this point. The jury's refusal to find Skerianz was entrapped is supported by substantial evidence and accordingly we hold Skerianz's defense of entrapment has no merit.[15]

### G. *The Sentencing Guidelines Claims*

We exercise plenary review over legal questions about the meaning of the sentencing guidelines, but apply the deferential clearly erroneous standard to factual determinations underlying their application. *Ortiz,* 878 F.2d at 126–27 (3d Cir.1989).

#### 1. *The Court's Application of the Extortion Provision Rather than the Blackmail Provision*

Skerianz argues that the court errantly applied the extortion provision under Sentencing Guidelines § 2B3.2, "Extortion by Force or Threat of Injury or Serious Damage," rather than § 2B3.3, entitled "Blackmail and Similar Forms of Extortion." The word extortion has a different meaning under the guidelines than it does under the Hobbs Act. As explained previously, the statutory crime of extortion requires only that the extortioner use fear of economic

harm to induce victims to part with their property and in doing so adversely affect interstate commerce. Typescript *supra,* at 649–50 & n. 8 (discussing the level of harm to victim that the Hobbs Act requires); *see Addonizio,* 451 F.2d at 59. However, Sentencing Guideline § 2B3.2, as it relates to extortion through fear of economic harm, indicates that quite serious economic harm must be threatened before the extortion guideline applies.

Indeed, the parties agree that there is a difference between the guidelines definition and the Hobbs Act and that the difference lies in the seriousness of the threat. They part company, though on the issue of how we decide whether the threat is serious enough to bring the extortion guideline into play. The government contends that whether the adverse consequences of noncompliance with the extortioner's demand are serious enough to meet the guidelines test is a factual issue that we review only for clear error. Skerianz argues to the contrary, that our review is plenary because the terms of the guidelines themselves require application of blackmail guideline § 2B3.3 and not extortion guideline § 2B3.2, to his case. We agree with Skerianz and will exercise plenary review over this sentencing guideline challenge because the question of which section applies involves a legal determination. *Ortiz,* 878 F.2d at 126–27.[16]

The application note to § 2B3.2, refers to a threat "to drive an enterprise out of business." U.S.S.G. § 2B3.2, comment (n. 2). In addition, blackmail guideline § 2B3.3 has nineteen offense levels measured in monetary terms rising in increments to $80,000,000.00, dependent on the amount of the victim's loss, but the extortion guideline § 2B3.2 has only nine offense levels and its highest loss increment is $5,000,000.00. *Compare* U.S.S.G.

---

**15.** Skerianz's attempt to discredit the testimony of his brother, Ferri, for various reasons is of no moment. Other testimony, including the tape of the December 20, 1988, meeting in Wilmington, is sufficient to support the jury's finding of no entrapment. Moreover, Skerianz's attack on his brother's credibility would be an argument to the jury, not this Court. Finally, we note the

jury could have agreed with Skerianz, discounted his brother's testimony and still found he was not entrapped.

**16.** The probation officer's opinion that Guidelines § 2B3.2, extortion, applies is, of course, not controlling on this legal issue.

§ 2B3.2(b)(1) (applying U.S.S.G. § 2B2.1(b)(2)) *with* U.S.S.G. § 2B3.3(b)(1) (applying U.S.S.G. § 2F1.1(b)(1)).

█ Moreover, the consequences of Skerianz's crime, if completed, would have been purely economic. Physical force was not involved. The guidelines' extortion section focuses on the use of firearms and threats of serious bodily injury. Both the blackmail and extortion sections talk about a demand for money. The difference between them lies in the kind of harm threatened. We hold the extortion section requires either a physical threat or an economic threat so severe as to threaten the existence of the victim. No such threat was made in this case. Accordingly, the guidelines have been misapplied. The blackmail provision, § 2B3.3, rather than the extortion provision, § 2B3.2 should have been applied to Skerianz's case. We will therefore remand the case to the district court so that Skerianz may be resentenced under § 2B3.3 instead of § 2B3.2.[17]

2. *Skerianz's Sentence Enhancement as the Organizer or Leader of Criminal Activity Involving Five or More Participants*

█ The district court increased Skerianz's offense level by four after finding that he was the organizer or leader of criminal activity that included five or more persons under Sentencing Guideline § 3B1.1(a). The court found that this group included Skerianz, Inigo, Giordano, Petrosino, Riva, Casucci and possibly deBianchini. Pointing again to an application note Skerianz argues that the district court's finding that five or more persons were involved in his scheme is erroneous because some of the people needed to make up a group of five are not criminally responsible. The government asserts that Petrosino was at least as culpable as Inigo and Giordano and that deBianchini too was criminally responsible. It also argues that Casucci and Riva were criminally responsible because of their joint involvement with PNB and, in Casucci's case, his presence in Wilmington when Skerianz first met with DuPont.

Skerianz again refers to an application note. It says a "participant" is one "who is criminally responsible for the commission of the offense, but need not have been convicted." Sentencing Guidelines § 3B1.1(a) comment (n. 1). Relying on this statement in the note, the Fifth Circuit has held that the "offense" includes the offense charged as well as "the underlying activities and participants that directly brought about the more limited sphere of the elements of the specific charged offense." *United States v. Manthei,* 913 F.2d 1130, 1136 (5th Cir.1990). This would include persons who are used to facilitate the criminal scheme, a result we hold is consistent with the guideline. Having so settled on the meaning of the term "participant in Guideline § 3B1.1(a) we review the district court's finding that there were at least five participants to determine whether it was clearly erroneous.

We have already noted that the theft of the documents from DuPont's Ducilo plant was an activity underlying Skerianz's scheme. *See* Typescript, *supra,* at 650–52. Thus, even if they were taken without Skerianz's approval, they became an essential card in Skerianz's hand when he dealt with DuPont. The participation of Giordano, Inigo and Petrosino in the attempt to use the technology in the documents to design a plant for Skerianz that could compete with DuPont in the spandex market make them participants under Guidelines § 3B1.1(a). Our holding that the evidence was insufficient to convict Inigo and Giordano does not control Skerianz's sentencing proceeding. U.S.S.G. § 3B1.1 comment (n. 1) (noting that a participant need not have been convicted). Inigo and Giordano did not have to be guilty of attempted extortion or conspiracy in connection with Skerianz's scheme so long as their own criminal conduct made it possible. Their misappro-

**17.** Skerianz also argues that the guideline determination was incorrect because of a typographical error that led the presentence officer to consider only the extortion provision, rather than both provisions. Having already determined that resentencing is appropriate, we need not address this issue.

priation of DuPont technology coupled with Skerianz's use of it in his extortion attempt adds them to the list of participants for purposes of determining Skerianz's guidelines sentence. *See Manthei*, 913 F.2d at 1136; *cf. United States v. Reid*, 911 F.2d 1456, 1465 (10th Cir.1990) (looking to "interdependence" of people involved in a drug ring).

Riva or Casucci are the other candidates for participation. Riva, with Skerianz, interviewed the Ducilo employees Skerianz sought to hire. He was therefore involved in what was, perhaps, the first step of the offense. Casucci accompanied Skerianz on his first trip to Wilmington and allowed his home to be used as headquarters for PNB. His presence in Wilmington gave Skerianz's deal credence in the eyes of Byrne although Byrne later became troubled by other aspects of Skerianz's deal after Casucci failed to attend the meeting with DuPont officials. The use of Casucci's home by the technicians kept the technicians distracted during Skerianz's negotiations and allowed Skerianz to pursue his negotiations with DuPont without interference or complaint from the technicians.

Thus, there were at least six participants involved in the offense under guideline § 3B1.1(a): Skerianz, Casucci, Giordano, Inigo, Petrosino and Riva. The district court's finding that there were more than five participants in Skerianz's scheme was not clearly erroneous and properly added four points to Skerianz's total offense under § 3B1.1(a).

3. *Skerianz's Objections to the District Court's Reliance on Hearsay in its Findings of Fact Pertinent to Sentencing*

██ Skerianz argues the district court erred in using unreliable hearsay evidence

as well as evidence that was not admissible at trial in sentencing him.[18]

A district court may rely on hearsay in determining the sentence for a person sentenced under the guidelines. *United States v. Sciarrino*, 884 F.2d 95, 97 (3d Cir.), *cert. denied*, —— U.S. ——, 110 S.Ct. 553, 107 L.Ed.2d 549 (1990); U.S.S.G. § 6A1.3(a). Information not in the record at trial may also be used. U.S.S.G. § 1B1.4; 18 U.S.C.A. § 3661 (West 1985). The only constraint on evidence introduced for sentencing purposes is that it must be reliable. *See Sciarrino*, 884 F.2d at 97 (referring to Fed.R.Evid. 803(24)'s "sufficient indicia of reliability" standard for use of hearsay is a good rule for use of hearsay in sentencing determinations).[19]

██ Skerianz's hearsay arguments lack merit. However, his objection to Isaac Assa's statement that the documents were illegally obtained merits brief discussion. The issue of theft was relevant to Skerianz's predicament because it goes to the heart of the extortion. If the technology were his own the case would take on a whole new light. However, the evidence at trial was, as we have noted, sufficient to show the technology was not Skerianz's own under the reasonable doubt standard applying to guilt, let alone the lesser preponderance standard that applies on sentencing. Therefore, any possible error in relying on Assa's statement is harmless error. Skerianz points to Giordano's testimony that he never suggested that any documents be taken from Ducilo. The reliability of Assa, who supposedly was "competing" with Skerianz was a question for the district court in the first instance. We cannot say as a matter of law that its reliance on Assa's statement was clearly erroneous. Accordingly, Skerianz's attack

---

**18.** He also argues that the way that the statement of the offense was communicated to the Federal Probation Office by the government was not in compliance with the sentencing guidelines. Specifically, he states that the inclusion of various statements unfairly portrayed Skerianz. However, he does not tell us precisely what statements were unfairly used or in what respects the statement of the offense was inaccurate.

**19.** Skerianz complains that when he objected to some of this evidence the government told the sentencing court that it was "not material" and so it is grossly unfair of the district court to rely on it. The government says this does not matter because all of the material was in fact relevant. Since Skerianz's hearsay objection has no merit, any unfair advantage the government obtained by changing position, if it did change position, did not prejudice Skerianz.

on the reliability of Assa's statement is also rejected.

## IV. CONCLUSION

We will reverse Giordano's and Inigo's convictions. We will affirm Skerianz's convictions but will vacate his sentence and remand to the district court for resentencing in a manner consistent with this opinion.