

2001 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

10-12-2001

# USA v. Lloyd

Precedential or Non-Precedential:

Docket 00-2409

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2001

Recommended Citation
"USA v. Lloyd" (2001). *2001 Decisions.* Paper 236.
http://digitalcommons.law.villanova.edu/thirdcircuit_2001/236

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2001 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed October 12, 2001

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 00-2409

UNITED STATES OF AMERICA,
        Appellant

v.

TIMOTHY LLOYD

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 98-cr-00061)
District Judge: Hon. William H. Walls

Argued April 19, 2001

Before: SLOVITER, RENDELL, and FUENTES,
Circuit Judges

(Filed October 12, 2001)

        Robert J. Cleary
         United States Attorney
        George S. Leone
         Chief, Appeals Division
        Shawna H. Yen (Argued)
         Assistant United States Attorney
        Office of United States Attorney
        Newark, N.J. 07102

         Attorneys for Appellant

          Edward J. Crisonino (Argued)
          Law Offices of Edward J. Crisonino
          Westmont, N.J. 08108

           Attorney for Appellee

OPINION OF THE COURT

SLOVITER, Circuit Judge.

A jury convicted Timothy Lloyd on one count of computer sabotage, a violation of federal law. After one of the jurors advised the court that she had learned from the media during the course of deliberations about off-site computer sabotage, the District Court granted Lloyd's motion for a new trial. The government appeals.

I.

BACKGROUND

Omega Engineering Corp. ("Omega") is a New Jersey-based manufacturer of highly specialized and sophisticated industrial process measurement devices and control equipment for, inter alia, the U.S. Navy and NASA. On July 31, 1996, all its design and production computer programs were permanently deleted. About 1,200 computer programs were deleted and purged, crippling Omega's manufacturing capabilities and resulting in a loss of millions of dollars in sales and contracts.

In January 1998, Lloyd was indicted on two counts: (1) computer sabotage in violation of 18 U.S.C. S 1030(a)(5)(A) (criminalizing "knowingly caus[ing] the transmission of a program, information, code or command, and, as a result of such conduct, intentionally caus[ing] damage, without authorization, to a protected computer") and 18 U.S.C. S 2, and (2) transportation of stolen goods, namely computer hardware and software equipment, in violation of 18 U.S.C. SS 2314 and 2. Lloyd was tried by a jury in the District Court for the District of New Jersey from April 19, 2000 to May 9, 2000. The government's theory of the case was that

2

Lloyd, an Omega employee, planted a computer "time bomb" in the central file server of Omega's computer network while employed there, and that the "time bomb" detonated after he was fired from the company. The defense's theory was that the massive deletion of files could have resulted from an accident or could have been caused by another employee, either intentionally or unintentionally. The defense contended that Lloyd could not have committed the act of sabotage because he did not have direct access to the system after he was fired and because he had no motive before he was fired, as his firing was without warning.

During the course of the trial, the government presented 10 witnesses and the defense presented 10 witnesses. The testimony showed that from 1985 to July 10, 1996, Lloyd worked at Omega as its only computer system administrator. In September 1995, Lloyd received Novell training, obtained Novell certification, and installed the Novell computer network onto Omega's computer system. With Novell, Omega was able to place all of its information on a central file server, which acted as a central storage device and allowed all the information on the server to be shared with other computers on the network. Government witnesses testified at trial that Lloyd was the only person who maintained the Novell computer network and had top-level supervisory access to it. One of the government's computer experts explained that supervisory access "means that . . . [an] account has full access to everything on the server." App. at 552. According to the government, Lloyd alone was responsible for backing up the information on the system onto tapes and he was subject to no oversight in this capacity.

The government argued to the jury that beginning in 1994 or 1995, Lloyd became a difficult employee. Witnesses testified that he repeatedly elbowed, shoved, and bumped colleagues in the hallways, and that he became verbally abusive. Apparently he was counseled on several occasions about these problems, but never improved his behavior. In May 1995, because of Lloyd's continuing interpersonal problems, he was transferred from supervisor of Omega's CNC Department (the manufacturing side of Omega's plant,

3

where machines actually created the thousands of products that comprised Omega's inventory) to a position as a manufacturing engineering support person. Lloyd's supervisor, James Ferguson, testified for the government that, even though he told Lloyd this change in positions was only a "lateral move," in fact it constituted a "demotion," as it took supervisory capabilities away from Lloyd. App. at 62. Courtney Walsh, a former subordinate and close friend of Lloyd who had since become estranged from him, replaced Lloyd as supervisor of the CNC Department.

Government witnesses testified at trial that they hoped this change in positions would cause Lloyd to improve his behavior, but it had the opposite effect and his interpersonal problems increased. In February 1996, Lloyd received a performance review and raise. His performance was rated a `7' on a scale of 1 to 10, which meant "often exceeds expectations." App. at 66. He also received a 4% raise, which was lower than his 7.2% raise in 1993, 4.6% raise in 1994, and 4.92% raise in 1995. App. at 67. The government argued at trial that the demotion, along with the substandard performance review and raise, indicated to Lloyd that he would soon be fired, thus providing him with the motive to sabotage Omega's computer system.

Government witnesses also testified that Lloyd had instituted a policy at Omega in late June 1996 to"clean up" all individual computers in Omega's CNC Department. The intention was to delete all unnecessary information from the individual computers. According to the policy, all employees were required to save their files to the file server and were prohibited from making their own backups. In accordance with this policy, Lloyd moved those portions of computer programs that ask end-users questions about safety precautions from the individual computers to the file server. Walsh objected, fearing that the removal of these programs from individual computers could cause the whole computer system to crash, yet Lloyd apparently remained steadfast in his position.

According to the government, Lloyd's behavior raised concerns with a number of Omega's managers, in particular Ferguson, who decided in late June 1996 that it

was time to fire Lloyd. Concerned that Lloyd had too much control over Omega's network and that his termination would leave no one at Omega with access to the network, Ferguson testified that he asked Lloyd to give access to the file server to himself, Al DiFrancesco in Human Resources, and another employee, William Wall. Lloyd never did so.

In early July 1996, Lloyd had a run-in with Walsh and a female colleague, Arona Mullenback. Lloyd met with DiFrancesco and Wall to discuss the matter, after which DiFrancesco realized it was time to fire Lloyd. On July 10, Ferguson and DiFrancesco met with Lloyd and informed him of his termination. They stated it was due to his longstanding interpersonal problems and the repeated incidents of physical intimidation. The firing was effective immediately and Lloyd was quickly escorted from the premises.

On July 31, 1996, Ferguson learned that the file server on Omega's computer system would not boot up. That same day Lloyd told representatives of W.L. Gore in response to the job application of Lloyd's friend Raymond Nabb, another Omega employee, that "everybody's job at Omega is in jeopardy." App. at 601-602. Days later, Ferguson realized that all of Omega's CNC programs on the file server, which contained instructions for operating the machines, had been lost and could not be recovered. Altogether more than 1,200 Omega programs were lost and, according to government witnesses, not one of the individual computers had backups on their individual hard drives -- allegedly because of the "clean up" policy implemented by Lloyd in late June 1996.

In response, Omega tried to hire locally-based programmers to recover the lost programs but these efforts proved futile. Thomas Inglin, one of the programmers trained in Novell networks, testified that the files had been deleted and "purged," i.e., rendered unusable and unrecoverable. App. at 425. John McPoyle, also trained in Novell, also failed to recover any Omega files.

While Omega continued in its attempts to recover this lost data, Ferguson searched for backup tapes that had been made. He contacted Lloyd and repeatedly asked Lloyd

5

for any tapes that he had but Lloyd answered that he had none. Ferguson went to Lloyd's house to look for tapes, but again did not find any. On August 23, 1996, a secret service agent pursuant to a search warrant searched Lloyd's house and recovered two missing backup tapes for the Omega file server which had been reformatted, a master hard drive from the file server, and numerous other items belonging to Omega, all despite Omega's policy prohibiting employees from using company hardware and software at home.

In August and September 1996, Omega continued to seek a solution, hiring a variety of programmers in hopes of recovering the lost data. Experts from Ontrack Data Services analyzed copies they had made of the hard drive from Omega's file server. Although they failed to recover the programs, the Ontrack experts concluded that the programs had been not only deleted but also "purged." App. at 500. Robert Hackett, Ontrack's Remote Data Recovery Operations Supervisor, testified at trial that "issu[ing a] `delete' . . . would be similar to someone just taking a piece of paper and putting it into the trash bin, [but] issuing a `purge,' that is going to take what's in the trash bin, . . . shred it into very small pieces, . . . and throw[ ] them all up in the air." App. at 500. Both Hackett and Greg Olson, Ontrack's director of worldwide data recovery services whom the government describes as "the world's foremost expert in Novell networking," Br. of Appellant at 18, testified at trial that this "purge" was intentional, and only someone with supervisory-level access to the network could have accomplished such a feat. App. at 502, 548. Government witnesses testified that normally with Novell networks only one person has supervisory-level access and that that one person at Omega was Lloyd.

Olson further testified that he had reason to believe July 30, 1996 was the trigger date that set off the actual deletion of files. Olson characterized a string of commands entitled "FUSE.EXE" as a "time bomb" because anyone who attempted to log on to the server on any date after July 30, 1996 would detonate the program and cause a massive deletion of data. He found that the program that deleted files was similar to a Microsoft program called"DELTREE,"

6

but only reconfigured for Novell. Olson ruled out the possibility of accidental deletion because of the specificity of the commands. He also testified that he examined the hard drive recovered from Lloyd's home and found the exact same strings of commands that comprised "FUSE.EXE." App. at 571-572.

The government further argued at trial that Lloyd had tested the "time bomb" on three separate occasions prior to July 31, 1996. Olson testified that the "time bomb" had been tested on February 21, 1996, on April 21, 1996, and on May 30, 1996. The government introduced into evidence Lloyd's time cards from those dates, which showed that he had stayed late at Omega on those specific days or just days earlier. App. at 569-571. Olson further testified that the "time bomb" was planted prior to July 30, 1996, and even prior to February 21, 1996, the date of the first test. App. at 585.

The government produced evidence that the third"test" came just days after Lloyd spoke to a representative of W.L. Gore & Associates at a job fair about a possible job opening. Lloyd then interviewed with W.L. Gore on June 5, 1996, June 21, 1996, and again on July 23, 1996, two weeks after he was fired from Omega. An employee in the human resources department at W.L. Gore testified that, in the interviews, Lloyd acknowledged that he was willing to accept a salary of $45,000, less than the $57,000 he was receiving from Omega. The W.L. Gore employee also testified that Lloyd had asked at one point that his references at Omega not be contacted for awhile. Sometime between July 23 and July 31, Lloyd was offered a position at W.L. Gore paying $49,000 per year, and he accepted. Prior to Lloyd's firing, Omega did not know he had been interviewing with W.L. Gore.

The government describes Olson's testimony as suggesting that "only an individual with system administrative skills, programming skills, Microsoft Windows experience, and independent knowledge of how to change the deleting program's message could have" committed the act of computer sabotage. Br. of Appellant at 22. It further contends that only Lloyd had each of these

7

necessary skills and the necessary access to commit this crime.

In response, the defense argued to the jury that the government's case was based on a series of assumptions that could not be proven. First, the defense tried to refute the government's evidence that Lloyd was a belligerent and uncooperative employee. Nine former Omega employees testified that they never had any problems with Lloyd and that Lloyd was always very professional. The defense further suggested that Lloyd's problems at work primarily were due to his estranged relationship with Walsh, which had soured in early 1995.

The defense also contested the government's assertion that Lloyd knew he would be fired and thus had a motive to commit the act of sabotage. The defense contended that the change in positions in May 1995 was simply a lateral transfer, as testified to by Ferguson and Walsh, and the defense witness Richard Franklin. Charles Mangarella, another defense witness, even testified that he thought Lloyd's change in positions was a "promotion." App. at 758. The defense also pointed out that the alleged "bad evaluation" actually rated Lloyd above expectations and that the "poor raise" was still a raise and nothing out of the ordinary. Moreover, the defense put before the jury Ferguson's strong recommendation of Lloyd to W.L. Gore, which Ferguson claimed at trial was nothing but lies. Ferguson described Lloyd to W.L. Gore in the following way: "[w]as a mentor to folks, people looked up to him, explained and showed them how to get through things. He was able to develop, coach, team into self manage teams [sic], self responsibility." App. at 605. Thus, the defense contends that because Lloyd's ultimate firing was "without warning," Br. of Appellee at 8, he had no motive to commit the sabotage.

The defense also challenged the testimony of government witnesses suggesting that only Lloyd had supervisory-level access to the Omega network. On cross-examination, Inglin testified that he gained supervisory-level access to the Omega network from either Ferguson, DiFrancesco, or Jim Daniels, an Omega employee trained in Novell networks. According to Inglin, "[s]omebody must have" had

8

supervisory rights in order to log on. App. at 423. Similarly, McPoyle acknowledged on cross-examination that at least seven Omega employees had supervisory-level access to the network. Olson as well testified on cross-examination that he came across two accounts that had supervisory access to the Omega network. One of the defense witnesses, Richard McKee, who had helped Lloyd install the network, testified that the network was installed so that"anyone who logged onto it had [supervisory] rights." App. at 679. Several defense witnesses also testified that the computer network had virtually no security at all. Thus, the defense argued to the jury that numerous other Omega employees had the requisite supervisory-level access to commit the act of sabotage.

The defense also contested the government's evidence regarding Lloyd's alleged "clean up" policy. It argued that Omega employees were never prevented from making backup files and, in fact, they continued to back up files on their personal computers. Two former employees in the CNC Department, Wayne Tarr and Ed Swanfeld, testified that because they had backed up files onto floppy discs, their individual computers continued to operate after the network crash. Swanfeld testified that nobody ever told him that he couldn't save his files onto his individual computer.

The defense further sought to refute the government's emphasis on the amount of Omega property recovered from Lloyd's home by pointing out that Lloyd often brought work home with him while employed at Omega, and that his supervisors knew this. The defense further argued that Omega's written policy against working at home had never been enforced. Lloyd did not testify.

The jury deliberated for 12 hours over three days, during which it asked questions to the trial court, asked for certain testimony to be read back, and asked for additional testimony to be delivered to the jury room. Ultimately, the jury convicted Lloyd on the count of computer sabotage but acquitted him on the count of transportation of stolen goods. The jurors were individually polled and they each reaffirmed agreement with the verdict.

Three days after the jury returned its verdict, on May 12, 2000, Francis Simpson, Juror No. 1, called the District

9

Court to express discomfort with her vote. The government immediately pointed the court to Federal Rule of Evidence 606(b) and recommended it conduct an informal in camera inquiry of the juror to determine whether she had been subject to extraneous information that prejudiced her. On May 16, 2000, the court conducted that hearing and then repeated its questioning of the juror in front of counsel.

Simpson told the trial judge that over the weekend in the midst of deliberations she saw a television report discussing a computer virus called the "Love Bug." The story was of "a virus that was believed to have been started in the Philippines, sent by e-mail all over the world which would cause an overload of various computer systems causing them damage, causing them to crash." App. at 906-907. The court then questioned as to the subjective effect of this information, and she stated that she learned that it was possible for the person who set off the "Love Bug" virus to affect computers worldwide, and thought that it was possible for Lloyd to have triggered the "time bomb" in the Omega computer system without having direct physical access to the computer server at the time. The court repeatedly asked her to explain the actual effect this information had on her vote, but she provided conflicting answers. In no particular order, she told the court that the information about the "Love Bug" had no effect, that she wasn't sure what effect it had, that it changed her vote, and that her decision to change her vote to guilty was more likely due to her willingness to pacify the other jurors. Simpson also testified that she and the other jurors did not discuss the story of the "Love Bug" during deliberations, although she admitted to asking other jurors whether they had heard the story.

After the hearing, Lloyd moved for a new trial and the District Court granted the motion. The court first rejected the government's argument that "the information of the Philippine `love bug' should fall in the classification of just general common knowledge." App. at 921. The District Court stated:

> . . . This case was tried vigorously and it was tried on the theory of somehow and sometime before he was terminated from his employment, this defendant

sabotaged the computer system at his employment place. Some weeks after he had been terminated, he never having been allowed to return to that employment, the system crashed.

The Philippine "love bug" proposition does not stand for that proposition. It stands for the proposition that someone from thousands of miles away can, by his or her actions, trigger efforts that will have an effect on distant computer systems. That was not the theory that the government advanced in this case and it therefore, seems to me, would follow that the average juror, having heard about the `love bug' and using that information, that's the key, and using that information, would place his or her vote upon an actual pedestal that was not presented to her by the government.

App. at 921-922. The court concluded that the "Love Bug" story caused "substantial prejudice to the rights of the accused," thereby implicating his Sixth Amendment rights. App. at 922. The government filed a timely notice of appeal. We have jurisdiction pursuant to 18 U.S.C. S 3731.

II.

DISCUSSION

The government contends on appeal that the District Court abused its discretion in granting the defendant's motion for a new trial based on Simpson's testimony about her subjective reaction to extraneous information and that the court's inquiry into her subjective reaction violated Rule 606(b) of the Federal Rules of Evidence.

We note that Lloyd's brief on appeal fails to address these issues, and instead concentrates on the Sixth Amendment's protection of the right of confrontation and cross-examination, issues we believe are not raised by the circumstances here.

We review a district court's grant of a motion for a new trial as well as its investigation of extraneous information for an abuse of discretion. See Wilson v. Vermont Castings, Inc., 170 F.3d 391, 394 (3d Cir. 1999). We also review for

11

abuse of discretion a district court's finding on whether the extraneous information prejudiced the defendant. See United States v. Bertoli, 40 F.3d 1384, 1392–93 (3d Cir. 1994).

As this court recently discussed in Wilson, we do not permit jurors to impeach their own verdicts. See 170 F.3d at 394. "The purpose of this rule is to promote finality of verdicts, encourage free deliberations among jurors, and maintain the integrity of the jury as a judicial decision-making body." Id. As an opinion from the Sixth Circuit recently stated, "[i]f . . . courts were to permit a lone juror to attack a verdict through an open-ended narrative concerning the thoughts, views, statements, feelings, and biases of herself and all other jurors sharing in that verdict, the integrity of the American jury system would suffer irreparably." United States v. Gonzalez, 227 F.3d 520, 527 (6th Cir. 2000). Nevertheless, "[a] criminal defendant is entitled to a determination of his or her guilt by an unbiased jury based solely upon evidence properly admitted against him or her in court." Virgin Islands v. Dowling, 814 F.2d 134, 138 (3d Cir. 1987). Rule 606(b) seeks to accommodate these competing considerations by providing:

> Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes.

Fed. R. Evid. 606(b).

Thus, a court may inquire into the verdict if " `extraneous prejudicial information was improperly brought to the jury's

12

attention or [if] any outside influence was improperly brought to bear upon any juror.' " Wilson , 170 F.3d at 394 (quoting Fed. R. Evid. 606(b)). However, "the court may only inquire into the existence of extraneous information," and not "into the subjective effect of such information on the particular jurors." Id.

It is apparent from the transcript of the District Court's interview with Simpson that the court's questioning went beyond the scope permitted by Rule 606(b). The court repeatedly asked the juror to describe the actual effect the information had on her vote. See Sealed App. at 946–949, 951–952. Such questioning clearly is impermissible under Rule 606(b), and when the District Court issued its order granting Lloyd's motion for a new trial it acknowledged that it "probably should not have asked [the juror] that question specifically." App. at 907. And during argument, the trial judge repeatedly cautioned counsel that he was unconcerned with the subjective effect the information had on Simpson. See App. at 916, 918, 921. Inasmuch as a portion of the District Court's questions and the juror's responses were not admissible under Rule 606(b), we limit our inquiry to the portion of the colloquy that was admissible, i.e., the juror's declarations detailing the nature and existence of the extraneous information. See United States v. Maree, 934 F.2d 196, 201 (9th Cir. 1991) (stating that "[i]n determining whether [the juror's] misconduct warrants a new trial, our inquiry is limited to the admissible portions of the declarations"). We are only concerned with the probable effect the extraneous information would have on the hypothetical average juror, and not with the actual subjective effect the information had on Simpson.

A new trial is warranted if the defendant likely suffered "substantial prejudice" as a result of the jury's exposure to the extraneous information. United States v. Gilsenan, 949 F.2d 90, 95 (3d Cir. 1991). In examining for prejudice, we must conduct "an objective analysis by considering the probable effect of the allegedly prejudicial information on a hypothetical average juror." Id. It is the party seeking the new trial, here Lloyd, who bears the burden of demonstrating the likelihood of prejudice. See Waldorf v.

13

Shuta, 3 F.3d 705, 710 (3d Cir. 1993). We independently review the record to determine if that party has met that burden. See Gilsenan, 949 F.2d at 95.

Several courts of appeals have applied a presumption of prejudice whenever a jury is exposed to extraneous information. See, e.g., Mayhue v. St. Francis Hosp. of Wichita, Inc., 969 F.2d 919, 922 (10th Cir. 1992); United States v. Perkins, 748 F.2d 1519, 1533 (11th Cir. 1984); United States v. Hillard, 701 F.2d 1052, 1064 (2d Cir. 1983); United States v. Bassler, 651 F.2d 600, 603 (8th Cir. 1982). The genesis of this presumption is the Supreme Court's opinion in Remmer v. United States, 347 U.S. 227 (1954), where the Court explained that "[i]n a criminal case, any private communication, contact, or tampering directly or indirectly, with a juror during a trial about a matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial, if not made in pursuance of known rules of the court . . . with full knowledge of the parties." Id. at 229.

This court has applied the presumption of prejudice only when the extraneous information is of a considerably serious nature. See Waldorf, 3 F.3d at 710 n.6; see also Bertoli, 40 F.3d at 1394 (commenting that only "certain extra-jury influences create" the presumption). In particular, we have tended to apply the presumption of prejudice when a juror is directly contacted by third-parties. See United States v. Console, 13 F.3d 641, 666 (3d Cir. 1993) (stating that application of the presumption is most appropriate when there is direct communication between a juror and a third-party during deliberations); see also United States v. Boylan, 898 F.2d 230, 261 (1st Cir. 1990) (applying "the Remmer standard . . . to cases of significant ex parte contacts with sitting jurors or those involving aggravated circumstances").

In contrast, we tend not to apply the presumption to circumstances in which the extraneous information at issue is a media report, such as a television story or newspaper article. See Gilsenan, 949 F.2d at 95-96 (not applying presumption of prejudice to media coverage of failed plea agreement in the case); United States v. D'Andrea, 495 F.2d 1170, 1172 n.5 (3d Cir. 1974) (per curiam) (not applying

14

presumption to media coverage of defendant's indictment on other charges and its description of him as a"reputed underworld figure"); see also Console, 13 F.3d at 666 n.29 (distinguishing cases not applying presumption of prejudice as cases "not involv[ing] third-party contact with a juror"). Yet, as this court stated in Waldorf, "[i]n some cases the publicity that occurs is so fundamentally prejudicial that actual prejudice is presumed as a matter of law. Where the improper publicity is of a less serious nature however, no similar presumption applies." 3 F.3d at 710 n.6 (quotation omitted). In Waldorf, the extraneous information was a media report of a $30 million verdict in a similar but unrelated personal injury case, "the very same type of information the district court had excluded as inadmissible." Id. at 707. Still, we declined to apply the presumption in that case. See id. at 710-11.

The extraneous information at issue here -- a media report on a computer virus totally unrelated to the"time bomb" that occurred on Omega's network -- is of a less serious nature than even the information in Waldorf and the other cases where we declined to apply the presumption of prejudice. Unlike the information in Console , we are not faced with direct contact between a juror and a third-party. And, unlike the extraneous information in Waldorf, the "Love Bug" story is both completely unrelated and factually dissimilar to the facts of the case. Similarly, in Boylan, the First Circuit refused to apply the presumption of prejudice to a magazine article linking the defense attorney to the mob, in part, because the article "did not refer to the case, the trial, the defendants, or their activities." 898 F.2d at 261. Likewise, we shall not apply the presumption of prejudice to this case. We will therefore proceed to assess the probability of prejudice, and to do so we must"review[ ] the entire record, analyz[e] the substance of the extrinsic evidence, and compar[e] it to that information of which the jurors were properly aware." United States v. Weiss, 752 F.2d 777, 783 (2d Cir. 1985).

In examining for prejudice, this court has never set forth a list of factors to consider, yet it is apparent from our jurisprudence that several factors do stand out as relevant to the analysis. To start, it is obvious that, for there to be

15

any possibility of prejudice, the extraneous information must relate to one of the elements of the case that was decided against the party moving for a new trial. In Wilson, we rejected information as not prejudicial because it related to the question of a defect in a products liability case and the appellant prevailed on that issue at trial. See 170 F.3d at 394. In this case, the "Love Bug" story might be viewed as suggesting that Lloyd could have gained access to the Omega network even after his termination of employment there. Because access to the network was a necessary component of the crime of computer sabotage, implicit within the jury's guilty verdict was a determination that Lloyd had that access. Therefore, our analysis must proceed further.

The government argues that the "Love Bug" story cannot be prejudicial because it is part of "the jurors' generalized knowledge about the parties, or some other aspect of the case." Virgin Islands v. Gereau, 523 F.2d 140, 151 (3d Cir. 1975). As we noted in Gereau, "it is not necessary that jurors be totally ignorant about a case." Id.  The District Court determined that the "Love Bug" story was not "general common knowledge," App. at 921, even though several members of the jury had computer knowledge. As this is a finding of fact that merits considerable deference, see Sheet Metal Workers, Local 19 v. 2300 Group, Inc., 949 F.2d 1274, 1278 (3d Cir. 1991); Fed. R. Civ. P. 52(a), and the fact that several jurors in this case "had never even used a computer," App. at 909, we are not willing to overturn the court's finding.

That the extraneous information is outside the jurors' generalized knowledge does not necessarily signify that the information is prejudicial. One factor often considered by courts is the extent of the jury's exposure to the extraneous information. See Console, 13 F.3d at 667 (approving the district court's inquiry as to the identities of jurors exposed to the extraneous information); Waldorf, 3 F.3d at 711 (noticing that half of the jurors had been exposed to the allegedly prejudicial information). In this case, that means we must inquire into what extent the "Love Bug" story was shared with the rest of the jury. Simpson testified that on the last day of deliberations -- the first day following media

16

reports of the "Love Bug" virus -- the jury did not discuss the "Love Bug" at all during the actual deliberations. Nevertheless, she admitted to asking "some jurors" if they had heard the story over the weekend, and they said they did, but the jurors "didn't discuss it, we mentioned it." Sealed App. at 953.

Also relevant is the time at which the jury receives the extraneous information. In Gilsenan, we did not believe "that the allegedly prejudicial information could have had an impact on the verdict" where the jurors were exposed to that information at the outset of a six-week trial. 949 F.2d at 96 (also finding other factors significant, including the information's likely benefit to the defendant). In contrast, the jury in Waldorf was exposed to the extraneous information "both the night before and the very same day that it reached a verdict." 3 F.3d at 713. The court noted that "a more critical moment would have been difficult to find." Id.; cf. Mayhue, 969 F.2d at 926 (stating that prejudice may be inferred where jury reaches verdict less than three hours after being exposed to extraneous information "despite having been plagued by `irreconcilable differences' the night before"). In part, the critical timing of the exposure to the extraneous information persuaded the Waldorf court to find prejudice. See 3 F.3d at 713 (also finding relevant the fact that the "information was precisely the type specifically excluded by the district court during trial"). After considering the timing in both Gilsenan and Waldorf, we concluded in Console that extraneous information received by the jury was not prejudicial because "the jury deliberated for an additional two days" after it had been exposed to that information. 13 F.3d at 668-69 (quotation omitted).

Here, Simpson was exposed to the "Love Bug" story over the course of the weekend that preceded the jury's final day of deliberations. Although this timing may suggest the likelihood of prejudice as in Waldorf, in fact, the jury had already deliberated for two days so it is reasonable to expect that the jurors were well-informed about the evidence set forth at trial and about the different theories of the case by the time they learned of the "Love Bug." Thus, it is unlikely that the average hypothetical juror would have

17

been influenced by such unrelated information. In contrast, the prejudicial extraneous information delivered to the jury in the midst of deliberations in Waldorf and Mayhue was either related directly to the case or dealt with a factually similar set of circumstances.

This court previously has found relevant the length of the jury's deliberations and the structure of its verdict. In Gilsenan, we noted that "the jury deliberated for a week and delivered a fractured[1] verdict showing that it carefully delineated among the offenses and between the appellants." 949 F.2d at 96. We concluded that such deliberate care suggested that the extraneous information did not prejudice the jury. See id.; see also Console, 13 F.3d at 669 (finding noteworthy the fact that the jury returned two partial verdicts before convicting the defendant on the count seeking reversal). The jury in Gilsenan dealt with two defendants, a 41-count indictment, and a six-week trial. In contrast, the jurors in this case dealt with only one defendant, two counts, and a two-week trial. Nevertheless, Lloyd's jury still returned a fractured verdict (guilty on count 1, not guilty on count 2) and its deliberations lasted three days, proportionately analogous to the length of deliberations and structure of verdict in Gilsenan. Moreover, during deliberations Lloyd's jury asked the court a number of questions and even requested that certain trial testimony be delivered to the jury room. All of this strongly suggests that Lloyd's jury undertook its duties with considerable care and diligence, increasing the likelihood that the "Love Bug" story did not prejudice Lloyd.

We also find informative the District Court's instruction to the jury at the close of trial that it should only consider the evidence developed in the case. App. at 794-796 (pointing the jury to the testimony at trial as well as documents and other physical items submitted into evidence). We presume that juries follow such instructions. See Gilsenan, 949 F.2d at 96 (finding noteworthy that the jury was exposed to the extraneous information "after the

_____

1. We were advised at argument that "fractured" in this context means that the jury was able to distinguish between the two counts, convicting on one and acquitting on the other.

18

jury was instructed to decide the case on the basis only of the evidence and not extrinsic information, an instruction the jury is presumed to have followed"). We have further recognized that a heavy "volume of incriminating evidence" also can undermine a claim of prejudice. United States v. Thornton, 1 F.3d 149, 156 (3d Cir. 1993); see also United States v. Hornung, 848 F.2d 1040, 1045 (10th Cir. 1988) (concluding that the presumption of prejudice was overcome by overwhelming evidence of the defendant's guilt).

The government's principal argument on appeal is that the overwhelming evidence of guilt at trial made the"Love Bug" story insignificant and irrelevant. The government's theory at trial was that Lloyd was an uncooperative, obstructionist, and belligerent employee who sabotaged Omega's computer network by "planting" a "time bomb" prior to his firing on July 10, 1996, set to detonate on July 31, 1996. The government contended that Lloyd knew he was going to get fired because he had been demoted, had been written-up, and had received a lower-than-expected performance review and raise, and that his motive was revenge. The government cites Lloyd's job interviews with W.L. Gore & Associates as evidence of his expectation of an upcoming departure from Omega. The government further argued to the jury that whoever committed the act of sabotage needed direct supervisory-level access to the Omega network as well as advanced computer programming skills, and that only Lloyd had both the requisite access and skills. Government witnesses testified to Lloyd's workplace behavior and even an expert testified that the same program that allegedly caused the"purge" of all the network files was also present on the hard drive of a computer found at Lloyd's home. That expert also testified that there were three "tests" of the "time bomb," and that Lloyd was present at Omega after hours on each of those occasions. At trial, the government specifically argued that Lloyd committed the act of sabotage by direct access before getting fired, not by remote access after getting fired.

It is apparent from the record that the government put forth credible evidence incriminating Lloyd in the computer sabotage under the theory that he knew his days at Omega

were numbered, and that he "planted" the "time bomb" prior to his termination at a time when he had direct access to the Omega network. Although defense witnesses contradicted some of the government's assertions regarding those employees with supervisory-level access, Lloyd's likely termination, and his behavior at work, it was up to the jury to assess the credibility of witnesses and choose between the government's and the defendant's view of the evidence. Further, there was strong uncontradicted evidence to support the verdict. Significantly, evidence that went unchallenged included: the string of commands found on the hard drive in Lloyd's home that was identical to that used in the program that purged the Omega network of all its files; the testimony that the "time bomb" had been tested three times previously and that on each occasion Lloyd had stayed late at the office; Lloyd's willingness to accept up to $12,000 less in a job with W.L. Gore than in his position at Omega; and Lloyd's comment to a W.L. Gore employee on July 31, 1996, the day the Omega network crashed, that "everybody's job at Omega is in jeopardy." App. at 601–602.

Most significant is the fact that the story of the"Love Bug" virus, as explained earlier, is entirely unrelated to the facts and the theories of this case. The "Love Bug" story suggests that a person with remote access to a computer (i.e., access from afar) could sabotage that computer. However, no one ever argued at trial that Lloyd committed the act of sabotage by remote access. Instead, the government emphasized that Lloyd only could have committed the crime before he was fired when he had direct access. In discussing the "Love Bug" story in the District Court, the prosecutor accurately pointed out that"we are talking about a virus, we are not talking about a time bomb. We are not talking about deletion of material. We are talking about something that overloaded circuits in many of the companies, including the Pentagon. It didn't delete information." Sealed App. at 956.

Notably, there was only one question that was ever asked at trial that had anything to do with the theory of remote access. On cross-examination, the defense questioned Ontrack expert Robert Hackett, "Were you ever asked, at

20

the outset of your data recovery attempt, to investigate whether this was done via modem?" Hackett answered, "No," and the questioner continued on to other subjects. App. at 524. Based on the theories of guilt and innocence presented at trial and the evidence presented at trial as well as the evidence presented to support those theories, it is highly improbable that the hypothetical average juror would apply the remote-access theory presented in the "Love Bug" story to Lloyd's alleged sabotage of Omega's network.2 The Court of Appeals for the First Circuit concluded in a similar case that "[b]ecause the [extraneous information] was not logically connected to material issues in the case .. . to find a material connection between the extraneous information and the jury's verdict would require an assumption that the jury members reached an irrational conclusion. We will not essay so long a logical leap." Boylan, 898 F.2d at 261 (quotation and citations omitted). We likewise will not make that leap.

We may overturn the verdict and grant a new trial only if there was a substantial likelihood of prejudice. See Waldorf, 3 F.3d at 711. We agree with the government that "[b]ecause the `Love Bug' virus was not related in the least to the facts or theories of the present case, that information would not have had an impact on the hypothetical average juror's vote in Lloyd's case." Br. of Appellant at 47. Thus, Lloyd has not met his burden of proof.

Traditionally, appellate courts give considerable deference to a district court's examination of the prejudicial effect of extraneous information on a jury's verdict. See Bertoli, 40 F.3d at 1393; Mayhue, 969 F.2d at 922. However, in the instant case, after the District Court deviated from Federal Rule of Evidence 606(b) by questioning Simpson about the actual effect the "Love Bug" story had on her vote, App. at 907, the court projected her subjective reaction, which was,

_____

2. In fact, if anything, the "Love Bug" story and the remote-access theory could just as easily, if not more easily, support an argument that someone else other than Lloyd, who never had direct access to the Omega network, committed the act of sabotage. See Gilsenan, 949 F.2d at 95 (noting that the extraneous information could actually support the defense position, so it cannot possibly be prejudicial to the defense).

21

at best, ambiguous, onto the hypothetical average juror. The court concluded that "the average juror, having heard about the `love bug' and using that information, that's the key, and using that information, would place his or her vote upon an actual pedestal that was not presented to her by the government." App. at 922. However, in light of the significant dissimilarities between the "Love Bug" and the "time bomb," the court's conclusion that the average juror would "use" the information at all cannot be sustained. Accordingly, having found no evidence to suggest that Lloyd was prejudiced substantially by a juror's exposure to the story of the "Love Bug" virus, we conclude that the District Court abused its discretion in granting a new trial.

CONCLUSION

We will reverse the grant of a new trial, reinstate the conviction on count one of the indictment for computer sabotage, and direct the court to proceed to sentencing.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit

22