

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-13-2004

# USA v. Anwo

Precedential or Non-Precedential: Non-Precedential

Docket No. 03-1662

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"USA v. Anwo" (2004). *2004 Decisions.* Paper 710.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/710

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**NOT PRECEDENTIAL**

THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 03-1662
_____

UNITED STATES OF AMERICA,

v.

MOHAMMED ANWO,
a/k/a Speller Traviale,

Appellant

_____

On Appeal from the United States District Court
for the District of New Jersey
D.C. No. 01-cr-00379
District Judge: The Honorable Dickinson R. Debevoise

_____

Submitted May 7, 2004 Under Third Circuit LAR 34.1(a)

BEFORE: SLOVITER and FUENTES, <u>Circuit</u> <u>Judges,</u> and POLLAK,[*] <u>District</u> <u>Judge</u>

(Filed: May 13, 2004)
_____

OPINION OF THE COURT
_____

_____

 *Honorable Louis H. Pollak, District Judge for the United States District Court for the Eastern District of Pennsylvania, sitting by designation.

POLLAK, <u>District Judge</u>:

On June 5, 2001 Mohammed Anwo was indicted for possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(1) and (2). Anwo filed a pretrial motion to suppress the firearm, alleging that it was unlawfully seized. The District Court held a suppression hearing and subsequently denied his motion. On July 18, 2002, Anwo was convicted by a jury on the one-count indictment. Following his trial, Anwo filed a motion for an *in camera* hearing, contending that several jurors were tainted by the outside influence of an observer at the trial. The District Court denied Anwo's motion after hearing argument.

Anwo now raises two issues on appeal. First, he argues that the District Court abused its discretion by failing to order an *in camera* inquiry to determine the nature of the alleged jury taint. Second, Anwo maintains that the District Court erred in denying his motion to suppress. For the reasons that follow, we will affirm.[1]

**I.**

We turn first to Anwo's claim that the jury was tainted by the presence of a courtroom observer. Anwo details the incident in his brief to this court:

> Approximately 45 minutes after the verdict, John C. Whipple, Esq., Mr. Anwo's attorney, observed three (3) jurors (Jurors numbered 6, 9 and 10) leaving the courthouse together. They were accompanied by a woman approximately 60 years old, whom Mr. Whipple had observed in the courtroom for the two (2) days of trial sitting two (2) rows behind the

---

[1] We have jurisdiction pursuant to 28 U.S.C. § 1291.

2

Government's counsel table.  She behaved as a friendly acquaintance of these jurors.  Sherry Hutchins Henderson, Esq., A.U.S.A., had also observed this woman during the trial and further had observed her with one of the jurors in or around the courthouse.  She failed to disclose that contact to the Court.  Neither Mr. Whipple nor Ms. Hutchins Henderson could identify the woman.  Based upon the observations made of the three (3) woman jurors and the "outside observer", a motion to summon the three (3) jurors for an in-camera inquiry was made to determine whether they were potentially tainted by outside influences.  The Court heard argument on the motion and denied the application on the same date.

Appellant's Br. at 7 (citations omitted).

The District Court, in denying Anwo's motion, provided the following explanation

for its decision:

[W]e have before us the defendant's motion to inquire of three jurors and perhaps of the third or fourth person as to any communication between the three jurors and the fourth person who was sitting in the courtroom during some or all of the trial.  The circumstances, as outlined in defense attorney Mr. Whipple's certification, are undisputed.  The woman was in the courtroom during a significant period of the trial, and perhaps during all the trial, and at the conclusion of the trial when the jury was parting, she joined up with three of the jurors and they left together.  The concern is, of course, that she may have been privy to matters which went on in the courtroom while the jury was not present which she then communicated to . . . her friends or current friends on the jury.
  The principal things that were discussed outside the presence of the jury were the charges to be given to the jury and the extent to which defendant, Mr. Mohammed A[n]wo's criminal record would be admissible on cross-examination, should he take the witness stand.
  As far as the charges to the jury are concerned, there's very little, if anything, of a nature that would be of any significance or relevance to jurors or persons hearing the proceedings . . . . The discussions of a prior criminal record which were not introduced into evidence because Mr. A[n]wo decided not to testify are of a different danger.  If all those criminal events were disclosed to jurors, it might well affect their judgment as to the guilt or innocence of the defendant.

3

It would seem, however, that these discussions were held at a time when the jury was not being held outside the courtroom to await further proceedings for that day, but were held at the end of the day when the jury could have been excused, when in all likelihood the person who was in the courtroom as an observer had also left . . . .

First place, it is with great reluctance that a court recalls jurors to testify about the verdict or what affected them and their decision. And it would only be done if there was some significant information or reason to believe that improper communication had been made to the juror. Here, there–while one can speculate there really is nothing to suggest that any improper information was conveyed to any of the jurors in this case, partly because it's unlikely that the person who was listening to the proceedings in open court would have communicated them to the jurors.

Secondly, jurors were warned, really repeatedly, not to discuss the case, even among themselves, and certainly not with friends, relatives and others outside the jury room, and not even in the jury room until the time came for them to deliver a verdict. Thus, there is a presumption that they follow these instructions, and I think the very likelihood is that they did.

So, consequently, I will deny the motion on the grounds that an inadequate showing or reason for believing that improper communication had been made was shown.

App. at 42-44.

This court reviews a district court's investigation of extraneous information received by a jury for abuse of discretion. *United States v. Lloyd*, 269 F.3d 228, 237 (3d Cir. 2001). In *Lloyd* this court spoke to several fundamental principles regarding the sanctity of the jury, stating that

> as this court recently discussed in *Wilson*, we do not permit jurors to impeach their own verdicts. *See* [*Wilson v. Vermont Castings, Inc.,*], 170 F.3d [391], 394 [(3d Cir. 1999)]. "The purpose of this rule is to promote finality of verdicts, encourage free deliberations among jurors, and maintain the integrity of the jury as a judicial decision-making body." *Id.* As an opinion from the Sixth Circuit recently stated, "if . . . courts were to permit a lone juror to attack a verdict through an open-ended narrative concerning

4

the thoughts, views, statements, feelings, and biases of herself and all other jurors sharing in that verdict, the integrity of the American jury system would suffer irreparably." *United States v. Gonzales*, 227 F.3d 520, 527 (6th Cir. 2000). Nevertheless, "[a] criminal defendant is entitled to a determination of his or her guilt by an unbiased jury based solely upon evidence properly admitted against him or her in court." *Virgin Islands v. Dowling*, 814 F.2d 134, 138 (3d Cir. 1987). . . .

Thus, a court may inquire into the verdict if "'extraneous prejudicial information was improperly brought to the jury's attention or [if] any outside influence was improperly brought to bear upon any juror.'" *Wilson*, 170 F.3d at 394 (quoting Fed. R. Evid. 606(b)). However, "the court may only inquire into the existence of extraneous information," and not "into the subjective effect of such information on the particular jurors." *Id*.

*Lloyd,* 269 F.3d at 237. The court applies a presumption of prejudice "when the extraneous information is of a considerably serious nature." *Id.* at 238.

In *United States v. Gilsenan*, 949 F.2d 90 (3d Cir. 1991), this court concluded that the district court acted within its discretion by not holding a hearing to determine the extent of extra-record information received by a jury. In reaching this result, we

recognize[d] that sometimes judges are tempted to order hearings to put matters to rest even if not strictly required. After all, a call for a hearing has an inherently reasonable ring to it. But this is not one of those circumstances for there are compelling reasons not to hold a hearing involving the recalling of discharged jurors. As the Court of Appeals for the Second Circuit recently said [in *United States v. Ianniello*, 866 F.2d 540, 543 (2d Cir. 1989) (omitting citations)]:
> We are always reluctant to 'haul jurors in after they have reached a verdict in order to probe for potential instances of bias, misconduct or extraneous influences.' As we have said before, post-verdict inquiries may lead to evil consequences: subjecting juries to harassment, inhibiting juryroom deliberation, burdening courts with meritless applications, increasing temptation for jury tampering and creating uncertainty in jury verdicts.

5

*Gilsenan*, 949 F.2d at 97. *Ianniello* provides a district court with significant guidance on the showing required to conduct the type of investigation Anwo requested: "[t]he duty to investigate arises only when the party alleging misconduct makes an adequate showing of extrinsic influence to overcome the presumption of jury impartiality." *Ianniello*, 866 F.2d at 543 (citations omitted). Specifically, "a post-trial jury hearing must be held when a party comes forward with 'clear, strong, substantial and incontrovertible evidence . . . that a specific, non-speculative impropriety has occurred[.]'" *Id.* (citations omitted).

Though Anwo recognizes the principles enunciated by *Wilson* and *Lloyd*, he is unable to meet the evidentiary burden imposed by *Ianniello* and *Gilsenan*. As the government points out, Anwo only has speculation to offer with respect to the identity of the courtroom observer, the periods of time she was in the courtroom, and the nature of her relationship and conversations with certain members of the jury. Anwo's difficulty is compounded by the fact that the District Court admonished the jury more than once to refrain from discussing the case amongst themselves or with others prior to deliberation. While a hearing may have alleviated some of Anwo's speculative concerns, because he has not and cannot present "clear, strong, substantial and incontrovertible evidence" regarding those concerns, we cannot say the District Court abused its discretion by declining to conduct a post-verdict voir dire of the jurors in this case.

6

Anwo also challenges the District Court's denial of his motion to suppress. In particular he argues that the court committed clear error in its factual findings. At the suppression hearing conducted by the District Court, Anwo and the government presented different versions of the events which led to the seizure of the firearm. Both agree that on the night of March 13, 2000, Anwo dropped a friend off in East Orange, New Jersey following a night out at a club in Newark. After dropping his friend off, Anwo headed back to his own home in East Orange. According to his testimony at the suppression hearing, Anwo was stopped at a traffic light in the right-hand lane of a two-lane street when a police car pulled up behind him with its siren on and lights flashing. Another police car pulled in front of him, effectively preventing him from leaving. Anwo testified that three officers pulled him out of his car, handcuffed him and placed him face down on the ground. According to Anwo, after searching him, they placed him in a police officer's car and searched his car. Anwo testified that he was then taken to the East Orange Police Department headquarters at which point "[t]hey brought the gun in, and they said it was mine[ ]. We debated for a minute, they read me my rights, charged me, and put me in the holding cell." App. at 130.

According to the government's recital, Detective Joseph Procuri, a member of the East Orange Police Department Records Information Bureau, left the East Orange police station at approximately 3:00 a.m. to get coffee from a diner for his coworkers. On

7

his way to the diner, he stopped at a red light behind Anwo's car. When the light turned green and Anwo did not move, Detective Procuri honked his horn, turned on his siren and then got out of his car to investigate Anwo's behavior. As he approached the car, he saw Anwo slumped over the steering wheel and radioed for backup, thinking that Anwo may need some assistance. Two patrol cars arrived at the scene, one driven by Detective Albert Alston and his partner Officer Matthew Goritski and the other driven by a Sergeant McCuster. They discussed the situation with Detective Procuri. Detectives Procuri, Alston and Sergeant McCuster approached the driver's side of the car, while Officer Goritski approached the passenger side. While Detectives Alston and Procuri tried to shake Anwo awake, Officer Goritski reached in the passenger window, put the car in park and pulled the keys from the ignition. While doing so, Officer Goritski noticed a gun in Anwo's lap and shouted "gun." Detective Alston grabbed the gun from Anwo's lap, and Detective Procuri and Sergeant McCuster grabbed him from the car and put him in handcuffs.

At the station, Anwo was advised of his Miranda rights and, in response to a question from Detective Alston, stated that he had been asleep at the wheel, was heading home from a club and had the gun for protection.[2]

The District Court, in denying Anwo's suppression motion, recognized

---

[2] The District Court also denied Anwo's motion to suppress this statement, a ruling which he does not challenge in this appeal.

inconsistencies in the officers' testimony,[3] but stated that "I don't think these detract from the basic account of what took place, and there are inaccurate police reports, two of them. Neither detract measurably from the testimony of the officers." App. at 157. The Court ruled that

> the statement[s] of the officers are accurate and correctly outline the course of events that were established. There is no basis to suppress the weapon. It was found in plain view during the course of a perfectly legitimate operation by the police officers, who at the outset thought they were assisting a passenger in distress or a driver in distress, and during the course of which they came upon the weapon.

*Id.* at 158. On appeal, "the court reviews the district court's denial of the motion to suppress for 'clear error as to the underlying facts, but exercises plenary review as to its legality in light of the court's properly found facts.'" *United States v. Riddick*, 156 F.3d 505, 509 (3d Cir. 1998) (quoting *United States v. Inigo*, 925 F.2d 641, 656 (3d Cir. 1991)). Furthermore, in reviewing the district court's decision to deny a motion to suppress, "this court may look at the entire record; it is not restricted to the evidence

---

[3] Though Detective Procuri testified to first hearing Detective Alston yell "gun"when they approached Anwo's car, Detective Alston testified that Officer Goritski was the first to alert the officers to the presence of a weapon. Officer Goritski's warning was apparently followed by Detective Alston's warning *See* App. at 70, 102. Detectives Procuri and Alston also provided inconsistent testimony about the particular lane where Anwo's car was stopped. *Id.* at 80, 111. Finally, in his police report, Detective Procuri stated that he saw a handgun between Anwo's legs as he approached Anwo's car. *Id.* at 88. Detective Procuri admitted that contrary to the description in his report, until Detective Alston issued his warning to the other officers, Detective Procuri only saw a steel object rather than a gun. *Id.* at 88-91. Detective Procuri also admitted that his report of the gun's location was based on an assumption he made rather than any direct observation. *Id.* at 94-95.

9

presented at the suppression hearing where the motion was denied." *Gov't of Virgin Islands v. Williams*, 739 F.2d 936, 939 (3d Cir. 1984).

Anwo targets the discrepancies between Detective Procuri's suppression hearing testimony and his police report and minor inconsistencies between Detective Alston and Detective Procuri's suppression hearing testimony to bolster his argument that the District Court's factual findings on the motion to suppress were clearly erroneous. In particular, he highlights Detective Procuri's difficulty in recalling the location of the gun before it was seized from Anwo, a conflict in the suppression hearing testimony identifying the officer who first alerted the other officers of the gun in Anwo's lap and inconsistent recollections about the location of Anwo's car.

Anwo's contentions are without merit. Despite the alleged inconsistencies Anwo points to, we are fully satisfied that the District Court was correct in "conclud[ing] that the statement[s] of the officers are accurate and correctly outline the course of events that were established." App. at 158. Detective Procuri's description of the events leading up to Anwo's arrest were largely corroborated by Detective Alston's testimony at the suppression hearing and Officer Goritski's testimony at trial. Supp. App. at 102-05. Moreover, the testimony adduced both at the suppression hearing and at trial from the police officers was, on the whole, consistent with Anwo's statement at the police station indicating that he fell asleep at the wheel following an evening at a club and was carrying the gun for protection. There is no basis to assign clear error to the district court's factual

10

findings.

## III.

For the foregoing reasons, the judgment of the District Court will be affirmed.